WATSON *v.* BLOSSOM *et al.*

(*Supreme Court, General Term, Fifth Department.* October 19, 1888.)

1. CONTRACTS—CONSTRUCTION.
   Where a note and bond are made at the same time, and under the same agreement, they must, as to the parties to them, be construed together and treated as parts of the same contract.[1]
2. NEGOTIABLE INSTRUMENTS—CONSIDERATION—GAMBLING CONTRACTS.
   One B. made a note for $510, the consideration of which was a sale to him of 34 bushels of "Bohemian oats" at $15 per bushel. The vendor, a corporation, gave a bond agreeing to sell for the maker 68 bushels of such oats within a year, for the same price, B. to pay the company a commission of 33⅓ per cent. for selling the same; "the price on this grain being a fictitious value for speculative purposes." *Held* that, as it was not in terms an agreement to pay differences dependent on the condition of the market, it was not void as a gambling transaction, under 1 Rev. St. N. Y. p. 662, § 8; 3 Rev. St. N. Y. (7th Ed.) p. 1962.[1]
3. SAME—CONSIDERATION—PUBLIC POLICY.
   Neither was it void because the contract was against public policy.
4. SAME—IMPOSSIBILITY OF PERFORMANCE.
   While the performance of its contract by the company might be improbable or difficult, it was not impossible, so as to defeat a suit on the note.
5. SAME—BONA FIDE PURCHASER.
   Where the evidence showed that the maker of the note was induced by fraud to make it, and enter into the agreement, and that plaintiff purchased the note for value before maturity, but the evidence was conflicting as to whether he knew, at the time of the purchase, that the agents of the company had obtained the note by fraudulent means, and was thereby chargeable with notice, it was error in the court to direct a verdict for the plaintiff, and refuse to submit the case to the jury.[1]

Appeal from circuit court, Orleans county.

T. D. Watson sued J. Blossom as maker, and L. Collamer as indorser, of a promissory note for $510, payable to J. M. Orcutt, or bearer. The note was given for 34 bushels of Bohemian oats, at the price of $15 per bushel, and a written instrument, of which the following is a copy:

"No—. Capital Stock, $100,000. Home Office, Ypsilanti, Mich. A Bond from the Bohemian Oat & Cereal Company, Incorporated under the Laws of the State of Michigan, December 21, 1884.

"Know all men by these presents that the Bohemian Oat & Cereal Company do hereby agree to sell sixty-eight bushels of oats for Mr. J. Blossom, at fifteen dollars per bushel, in cash or by note, for which said J. Blossom is to pay thirty-three and one-third per cent. commission for selling, said commission to be paid in notes for which said grain is sold, said grain to be sold on or before October 26, 1887, the price on this grain being a fictitious value for speculative purposes. In testimony whereof the said Bohemian Oat & Cereal Company has caused this bond to be signed and sealed by the superintendent of said company this 26th day of October, 1886. This company is not to be held responsible for any outside contracts made by agents other than those expressed on face of this bond. This bond is void without the company seal and signature of superintendent.

[L. S.]　　　　　　　　　　　　"J. M. ORCUTT, Superintendent."

The court directed a verdict for plaintiff.

Argued before BARKER, P. J., and BRADLEY, HAIGHT, and DWIGHT, JJ.

---

[1] In Sutton v. Beckwith, (Mich.) 36 N. W. Rep. 79, cited in opinion, it was held, not only that the note given for Bohemian oats, and the agreement returned, constituted but one transaction, but that a purchaser of the note, with notice of the agreement, was bound by the latter.

*Thomas & Desmond*, for appellants.    *W. E. Hobby*, for respondent.

BRADLEY, J.    The note and bond having been made at the same time, and pursuant to the same agreement, they must, as between the parties to them, be construed together, and treated as parts of the contract, to the effect (in view of the extrinsic attending facts) that the defendant agreed to and did purchase of the Bohemian Oat & Cereal Company 34 bushels of Bohemian oats at $15 per bushel, making $510, secured by his note, payable in 13 months; and the company agreed, and by its bond undertook, to sell for him, within one year, 68 bushels of like oats at $15 per bushel, and render to him the proceeds of the sale, less 33⅓ per cent. commission.

The first inquiry is whether the transaction itself, represented by what then occurred, was in its character illegal, or, as between the parties, for any reason, furnished to the defendant means of defense against liability on the note. The defendant was at liberty to pay, or promise to pay, that price for the oats, and, if he could find a buyer, to sell oats for a like price, although they were actually worth no more than 30 cents per bushel. He evidently made the purchase, and promised to pay that large price, with a view to the profit he expected to realize out of the contract from the performance by the company of the undertaking of its bond to sell for him double the quantity of his purchase at the same price, which, being done before the maturity of his note, would enable him to pay it, and leave him a profit of $170, less the accrued interest on the note. This was the advantage the defendant was induced to rely upon as the result of the transaction.    The contract was not a gaming one, within the meaning of the statute, and is not void as such.    1 Rev. St. p. 662, § 8; 3 Rev. St. (7th Ed.) 1962.    While it is true that the sale which the company undertook to make depended upon its ability to do so, and was a matter of uncertainty, it was not in terms an agreement to pay differences dependent upon the condition of the market.    It purported to be an agreement that one party should furnish to the other the property, which the latter should sell at, or not less, than a specified price.    The company apparently by it took the hazard of a market which should permit performance, and of liability for damages in cases of default; yet the terms of it do not import that the parties were speculating upon the ability of the company to sell, with a view simply to the payment of a sum to represent the difference between the price the company agreed to, and could obtain for the property within the time specified.    *Bigelow* v. *Benedict*, 70 N. Y. 202; *Story* v. *Salomon*, 71 N. Y. 420; *Yerkes* v. *Salomon*, 11 Hun, 471.    The construction applicable to this contract is clearly distinguishable from that of the agreement upon which was brought the action in *Hall* v. *Bergen*, 19 Barb. 122.    There the price to be paid for a horse was made dependent upon the speed it made in a race against time, which was held to be in the nature of a wager; while in the case at bar the agreement to give the defendant the benefit of a sale at a particular price was unqualified. It contravenes no statute of this state to which our attention has been called. The defense, founded on the alleged illegality, must therefore rest upon the common law for its support, and if any part of the consideration may be characterized as illegal it vitiates the contract, and, as between the parties to it, would defeat a recovery on the note.    It is contended that the agreement in question was against public policy.    This proposition involves the inquiry whether it was repugnant to good morals, prejudicial to the public welfare, or in violation of some principle of law.    We are now dealing with the legal import of the terms of this contract, and in that view it is difficult to see that it is obnoxious to any rule of law, or void as against public policy.    It is true that the stipulated value of the oats, and the price for which the company undertook to sell them for the defendant, were fictitious, and purposely made so for "speculative purposes."    This was declared in the bond, and so understood by the parties to it.    The consummation of the expressed purpose might

be produced by unfair means, it might require deception, and its use result in prejudice to the innocent and unwary, but not necessarily so. This is the consequence of requiring exorbitant prices for property of any kind. The offer of the oats in the market for the price the company undertook to sell might not find the response of a purchaser. It very likely was not a wise one, but that does not necessarily bring the undertaking within legal inhibition. As a rule, men of full age and understanding have the liberty of contracting, and their contracts, when entered into voluntarily, are ordinarily held binding, unless they are contrary to public policy, or in violation of some rule of law. *Printing, etc., Co.* v. *Sampson*, L. R. 19 Eq. 462, 465, 12 Moak, Eng. R. 841. If the undertaking of the company was impossible of performance, that would be an effectual defense to an action on the note, because an impossible consideration will not support a promise. 1 Pars. Cont. 382. To be such, the impossibility must exist in the nature of the thing to be done. The difficulty or improbability of doing it is not sufficient to defeat its effect as a consideration. This case, we think, is not brought within that rule.

In the view taken of the case, the only ground upon which the defense can rest is that the note was obtained from the defendant by fraudulent means, and that the plaintiff was not a holder of it in good faith. The inquiry in this respect relates to the purpose and intent of the party or parties who, in the transaction, dealt with the defendant, and obtained from him his note. The contract was a remarkable one, and, in view of the actual value of the property which was the subject of the deal, the undertaking of the company, and its performance, were apparently impracticable as a business engagement. The oats purchased by the defendant furnished no adequate consideration for the note he gave. This he understood. The main inducement and consideration of the note was the agreement of the company to sell for him oats at a price nearly, or quite, 50 times their value, which he was induced to believe was made in good faith, and would be so performed as to make his investment a profitable one. With the aid of these facts, the inference from the instrument itself was permitted that the superintendent who made the bond, or the company he represented, did not, at the time it was made, intend to perform the undertaking expressed in it, but that it was made as an inducement to the defendant to give his note, and with the intent to cheat and defraud him. It might be difficult to understand how a man of ordinary sagacity could be led into such a contract if it had not in the past been historically recorded and demonstrated to observation that belief in representations quite unreasonable is too frequently supported by misplaced confidence in those whose purpose is to circumvent their confiding victims. There was also evidence tending to prove, and permitting the conclusion, that, for the purpose of inducement to the defendant to enter into the contract, it was represented to him that the company had a capital of $100,000, and was abundantly responsible, and that this was not true, but, on the contrary, that, while the capital stock was nominally such, the amount paid in was only 10 per cent., and that may have been represented by notes. It is not deemed necessary to make specific reference to the fortifying circumstances employed, and which the operators in the name of the company had produced by previous transactions with two or three persons in the town, who are said to have profited by performance. It may be that such fact, with the aid of those persons in support of the representations of the principal actors in the transaction, may have had some influence upon the defendant and others who entered into like contracts. Whether this pioneer enterprise in the town tends to indicate good faith on the part of the agents of the company in making the contract in question, or was designed as a leader preparatory to a business of this character more extended there, and disastrous to their customers, is a matter which may be entitled to some consideration with the other facts bearing upon the question of the purpose and good faith of the parties who conducted the transaction with the de-

fendant. The evidence presented a question of fact for the jury, and upon it the conclusion was warranted that the company, through its agents, did not at the time it was made intend to perform its undertaking expressed in the bond, and that the defendant was, by fraud on their part, induced to enter into the agreement, and make the note in question. *Sutton* v. *Beckwith*, 36 N. W. Rep. 79; *Mace* v. *Kennedy*, Id. 187; *McNamara* v. *Gargett*, Id. 218. But the fact so found would not defeat the right of the plaintiff to recover, unless he was charged with notice of such fraud. The note was negotiable. He in the outset has the benefit of presumption that he became the holder of it in good faith for value; and the duty was not imposed upon him of inquiry into the circumstance under which the note was given. The rule in respect to commercial paper is such that a party taking it in regular course of business for value, before maturity, has the right to assume that it is valid, and it will be so treated in his hands until it is shown to have been void by force of some statute, or until it is made to appear that when he received it he was chargeable with notice of facts which, as between the parties to it, would be available as a defense to defeat recovery upon it. *Welch* v. *Sage*, 47 N. Y. 147; *Seybel* v. *Bank*, 54 N. Y. 288; *Insurance Co.* v. *Hachfield*, 73 N. Y. 228; *Parker* v. *Conner*, 93 N. Y. 127.

The evidence given on the subject tends to prove affirmatively that the plaintiff purchased the note before maturity, and paid value for it; and there is also evidence tending to prove that before he purchased it he was advised of the deal and contract pursuant to which the note was given, that he had notice of the nature and terms of the bond given by the company, and, further, that he understood, by reading articles published in a newspaper of the county upon the subject, that the transactions of the character of that in question, conducted in the name of the Bohemian Oat & Cereal Company, were fraudulent on the part of the agents of the company, and that their purpose in making the contracts, and obtaining the notes of the farmers, was to swindle, cheat, and defraud them. There is also some evidence to the effect that, in talking upon the subject, the plaintiff had expressed his opinion that those transactions were "a gambling scheme, and that somebody would be the loser." Without referring more specifically to the evidence bearing upon the question of plaintiff's knowledge of the consideration of the note, the circumstances under which it was obtained, and of his information, and the reason he had to suppose that in the transaction the agents of the company, in dealing with the defendant, and obtaining his note, acted in bad faith, and with the intent to defraud him, the evidence was sufficient to present the question to the jury as one of fact, and to permit the finding that when the plaintiff purchased the note he was chargeable with notice of such facts and fraudulent intent, and, as a consequence, the benefit and character of a purchaser or holder of the note in good faith was denied to him. The consideration, however, of this question of fact by the jury is dependent upon the finding by them of the one before mentioned in the affirmative. Otherwise the question whether or not the plaintiff is a holder *mala fide* will not arise. If these views are correct, the conclusion follows that the case should have been submitted to the jury, and that the exceptions to the refusal of the court to do so, and to the direction of a verdict, were well taken. The judgment and order should be reversed, and a new trial granted, costs to abide the event. All concur.