MATSON v. BLOSSOM *et al.*

*(Supreme Court, General Term, Fifth Department.* April 11, 1890.)

NEGOTIABLE INSTRUMENTS—CONSIDERATION—BONA FIDE PURCHASERS.

 In a suit against the maker by the purchaser for value before maturity of a note given in consideration of a contract, which from its nature was improbable and speculative, where the evidence shows that defendant was induced to make the note through fraudulent representations of the payee, and is conflicting as to whether plaintiff knew of such fraud at the time of his purchase, a verdict for defendant will not be disturbed. Following *Matson* v. *Blossom*, 4 N. Y. Supp. 489. CORLETT, J., dissenting.

Appeal from circuit court, Orleans county.

T. D. Matson sued J. Blossom as maker, and L. Collamer as indorser, of a promissory note for $510, payable to J. M. Orcutt or bearer. The note was given for 34 bushels of Bohemian oats, at the price of $15 per bushel, and a bond in which the seller of the oats agreed to sell for said purchaser, within a certain time, 68 bushels of oats, at $15 per bushel, deducting therefrom a commission for making the sale. From a verdict and judgment for defendant Blossom, plaintiff appeals.

Argued before DWIGHT, P. J., and MACOMBER and CORLETT, JJ.

*W. E. Hobby,* for appellant. *Thomas & Desmond,* for respondents.

PER CURIAM. Judgment and order appealed from affirmed, on authority of the decision in this case on former appeal, reported in 4 N. Y. Supp. 489.

CORLETT, J., (*dissenting.*) On the 26th day of October, 1886, the defendant executed and delivered his promissory note, of which the following is a copy:

"$510.00.   HAMILTON TOWNSHIP, MONROE COUNTY, N. Y., October 26, 1886.

 "Thirteen months after date I promise to pay J. M. Orcutt or bearer five hundred and ten dollars, payable at North Parme, with interest at six per cent., value received.                    JUSTIN BLOSSOM."

The consideration of this note was 34 bushels of Bohemian oats, valued at $15 per bushel, and a bond of which the following is a copy:

"No. ———.                     Capital Stock, $100,000.62.

"HOME OFFICE, YPSILANTI, MICH.

 "A Bond from the Bohemian Oat and Cereal Company, incorporated under the laws of the state of Michigan, December 21st, 1884. Know all men by these presents, that the Bohemian Oat and Cereal Company do hereby agree to sell sixty-eight bushels of oats for Mr. J. Blossom at $15.00 per bushel, in cash or by note, for which said J. Blossom is to pay 33⅓ per cent. commission for selling, said commission to be paid in notes for which said grain is sold; said grain to be sold on or before October 26th, 1887, the price on this grain being a fictitious value for speculative purposes. In testimony whereof the Bohemian Oat and Cereal Company has caused this bond to be signed and sealed by the superintendent of said company, this 26th day of October, 1886. The company will not be held responsible for any outside contracts made by agents, other than expressed on face of this bond. This bond is void, without the company seal and signature of superintendent.

[L. S.]                      [Signed]       "J. M. ORCUTT, Supt."

The plaintiff bought the note from one Luther Collamer on the 30th day of March, 1887, paying him therefor the sum of $500. The action was tried in February, 1888, at the Orleans circuit, before the court and a jury. The court directed a verdict for the plaintiff. A new trial was granted, (4 N. Y. Supp. 489,) and the action was tried before the same justice and a jury in February, 1889. It resulted in a verdict for the defendant, a motion for a new trial was denied, judgment was entered on the verdict, and the plaintiff appeals to

this court. There was no concealment by either party to the contract as to its true scope and meaning at the time it was made. The company or its agent received a note for $510 in consideration of 34 bushels of oats and its bond. The oats at the time were worth about 30 cents a bushel, which was equally well known to both parties. By the terms of the bond the defendant would receive a net profit, after paying his note, of $170; also the 34 bushels of oats, and would get the money before his own note fell due; so that in fact, without using a cent of money, he would get the $170 and the oats as his share of the profits of the contract. The company would get the money it received for the note, and also 33⅓ per cent. commission for selling the 68 bushels. It was a part of the scheme, and both parties equally understood it, that a successful outcome of the contract, securing the expected results to both parties, would require purchasers who would take the 68 bushels from the company at the price of $15 per bushel. In the nature of things, both parties knew that no sale could be made at that rate without the same inducements on the part of the purchaser as produced the present contract. How long speculative and fictitious business operations carried on in that way would last would depend largely upon the profits made by previous speculators. Avarice, whetted by expectations based upon profits made by other people, might induce large purchases, and quite a time might elapse between the origin of the scheme and its ultimate collapse. It required no special intelligence to see that final disaster was inevitable, but the defendant, like others who engage in similar enterprises, expected to realize large profits, and that he would not be one of the ultimate victims. Quite a number of enterprising and vigilant speculators made money by purchasing oats under similar contracts, and a knowledge of their financial achievements, without doubt, exerted a potent influence in inducing the defendant to become a party to the scheme. This court held that the contract was valid and enforceable. The nature of the contract might induce the parties to it to carefully examine the financial soundness of the party to perform in future, and there would be reason for the defendant to acquaint himself with the financial soundness of the company. Where one is to receive great profits without adequate consideration, he is also aware that corresponding risks are involved. Great expectations, of a speculative character, include risks in proportion to the benefits expected. It often happens, however, that the attention is so riveted upon the glittering prize as to prevent the exercise of caution or inquiry. This element of human nature accounts for the want of care or caution exercised by persons who enter into wild-cat schemes. The purchaser of the note occupied a different position. He was concerned with the responsibility of the maker. The discount and interest were the only profits in store for him, and he would have no occasion to examine the transaction out of which the note arose, unless it might be to aid him in determining whether a person engaging in a speculative undertaking would be likely to continue solvent. In the present case there is nothing to indicate that the plaintiff in making the purchase did anything except to satisfy himself of the solvency of the maker of the note. The contract in reference to the oats, as between the parties, was equally obligatory upon both, and neither could predicate fraud against the other on account of the extravagant terms of the agreement. They were equally acquainted with its phraseology and purposes, and entered into it induced by the same motives, and, in the absence of fraudulent representations, outside of the contract there is no color for the claim that either could allege fraud against the other. It is a familiar rule that "a party can only commit a legal fraud in a business transaction with another by fraudulent misrepresentations of fact, or by such conduct *. * * as will mislead the other party or throw him off his guard, and cause him to omit inquiry or examination which he would otherwise make." *Dambmann* v. *Schulting*, 75 N. Y. 55.

This rule, applied to this case, is conclusive upon the proposition that the defendant could not be defrauded by the contract, or anything connected with it, except fraudulent representations by the other party inducing him to enter into it. The fraudulent representations in this case, alleged in the answer, upon which any materiality can be placed, are those relating to the solvency of the company, and its amount of paid-up capital. Representations upon those subjects might induce the making of the contract, which otherwise might not have been made. An examination of the case, in the light of the above suggestions, clearly show that it was tried and disposed of upon a wrong theory. The distinction between the position of a party and that of a stranger to the contract was obviously lost sight of. The second and third answers indicate that the defendant intended to rely upon the extravagant terms of the contract as evidence of fraud. On the trial the defendant's counsel gave evidence tending to show that the plaintiff believed the scheme so extravagant as to be of short duration; also that the note was given for Bohemian oats. The plaintiff's counsel made efforts to prove that the plaintiff did not know what the consideration of the note was, and that he was especially ignorant of the fact that it was given for Bohemian oats. The evidence, as a whole, clearly shows that the jury might well have found that the plaintiff did know what it was given for. In view of the contention over that point, such a finding would naturally prejudice the plaintiff, and very likely cause a general verdict against him. The controlling importance given to this knowledge was in the fact that, in view of the character of the contract, the defendant had a right to believe, and did believe, that the other party to it would never fulfill. It was assumed that, if the plaintiff knew of the terms of this contract, he would be advised of the probability of non-fulfillment. Such evidence was regarded by the defendant's counsel as strongly tending to establish fraud. The declarations alleged to have been made by the plaintiff, to the effect that the company might last a while, but not long, were treated as evidence tending to charge him with knowledge of the fraud. But, as above shown, in the absence of fraudulent representations of the character already indicated, a knowledge that the note was given for Bohemian oats, including a full acquaintance with all the provisions of the contract, would not be evidence tending to establish knowledge of fraud. The plaintiff's declarations undoubtedly had reference to the inflated terms of the contract. He was impressed with the conviction that such schemes were, in their very nature, of short duration. In that his own opinion accorded with those of other men, but the fact that he knew that the note was given in the making of such a contract, and by one of the parties to it, could not in any sense be evidence showing that a fraud was practiced upon the maker.

The learned counsel for the defendant placed stress and reliance upon the plaintiff's knowledge of the contract as evidence from which the jury, in connection with other testimony, might infer full knowledge of the fraud. The learned counsel for the plaintiff, instead of controverting this position, acquiesced in it to such an extent that the court was not called upon or required to state the distinction to the jury. It is true that the trial justice appreciated the force of the distinction, for he stated to the jury: "Therefore the case really stands upon representation as to the capital of this company, as to the representation that it had a capital of $100,000, and had the ability to pay its obligations, and to protect those who were dealing with it." After that the learned justice comments on the testimony of the nature above mentioned, including the articles published in the Rochester Union. In admitting the newspaper articles, the trial justice held that they were not evidence of any of the matters stated in them, but they were admitted merely for the purpose of showing that the plaintiff's attention was called to the alleged transactions of the company; in other words, as a link in the chain which might prove knowledge on the part of the plaintiff of a fraud practiced upon the defend-

ant. But they were not treated as sufficient evidence of fraud to warrant a verdict against the plaintiff. The theory upon which the case was tried led the trial justice to say in his charge: "The mere fact that this note was given for Bohemian oats, and that the plaintiff knew it at the time he became the purchaser of this note, is not sufficient to support the contention of the defendant that he became a purchaser of this note with notice of the fraud under which it was procured from the defendant, if it was so procured; that fact, in and of itself, is not sufficient to charge him with notice of the fraud. But the defendant goes further, and says that the plaintiff did have notice over and beyond what was conveyed to him by information to the effect that this note was given for Bohemian oats." The justice then proceeded to state that there was some conflict in the evidence as to whether the plaintiff knew when he bought the note that it was given for Bohemian oats. This portion of the charge must be construed as indicating that the jury might take into consideration the fact that the note was given for Bohemian oats, as some evidence tending to show that the plaintiff had knowledge of fraud practiced on the defendant; but that such knowledge, standing alone, would not be sufficient. As already shown, it could not be treated as any evidence against the plaintiff on that subject. In this connection the plaintiff's counsel requested the justice to charge: "I also ask your honor to charge that if the jury shall find that the defendant omitted to use reasonable care in making the contract with the Bohemian Oat and Cereal Company, that he is not entitled to the benefit of the defense that they made the contract with him not intending to perform it." While the court declined on the ground that he had already charged on that subject, still the request shows that the plaintiff's counsel proceeded upon the assumption that the nature of the contract itself, if known to the plaintiff, might be treated as some evidence of his knowledge of a fraud upon the defendant. The requests to charge on the part of the defendant's counsel proceeded on the same assumption.

The evidence fails to show that the plaintiff, at the time he bought the note, had knowledge that the defendant was induced to make the contract by fraudulent representations outside of its terms. The particular attention of the court was not called to that question in such a way as to require a distinct ruling. All the declarations and statements of the plaintiff naturally had reference to a speedy dissolution of a concern engaged in such transactions, and making such contracts; but no witness testifies that he stated that he knew of any false representations made to the defendant on the subject of the company's solvency. The character of the contract was constantly kept before the jury as furnishing evidence that a fraud was practiced upon the defendant. It is highly probable that the jury, in determining the question of fraud, attached weight to the contract. It is claimed that this court has passed upon this question. An examination of the opinion of the learned justice shows that the attention of the court was not called to the point. The evidence given on the trial does not appear in the case, but it does appear, inferentially, that the learned justice treated the contract as of such a character that it might be evidence against the plaintiff on the question that the defendant did not intend to perform its contract, and had therefore practiced a fraud upon him. It is fair to assume that the learned justice was led to make these remarks by the position of counsel, and their assumption that it was evidence which could be taken into consideration on that question. The opinion is not controlling on the new trial. *Siedenbach* v. *Riley*, 111 N. Y. 560, 19 N. E. Rep. 275. If this note had been given for a horse sold to the defendant at its actual value, it would not be urged that that circumstance would, either by itself or in connection with other testimony, tend to establish fraud. The oat contract must be construed in the same way; for its terms, as already shown, could not have been a fraud upon the defendant, and a knowledge of them on the part of the plaintiff would be no more evidence that he knew that a fraud had been prac-

ticed upon the defendant than if it had been given for a horse. No duty was imposed upon the plaintiff to ascertain whether the company would fulfill its contract. He had no concern in that question. The safety of his purchase depended upon the financial condition of the maker. The plaintiff was sworn as a witness on his own behalf, and after giving evidence tending to show that he bought the note in good faith and for value, and that the company up to that time performed all its promises, was asked this question: "At the time you purchased this note did you believe that they would continue to transact their business, and do so in the future in that vicinity?" The defendant's counsel objected to the evidence as incompetent and immaterial. The objection was sustained, and the plaintiff's counsel excepted. On the theory upon which the case was tried it is difficult to see why this evidence was not admissible. The defendant's counsel had given evidence which he claimed tended to show that the company did not intend to fulfill its contract with the defendant, and that plaintiff knew it. The plaintiff, when put on the stand, testified that up to the time he bought the note he understood that the company had performed all its contracts. Then he was asked, in substance, whether he believed it would continue to do so. The evidence certainly was material on that question. The duty of vigilance was not imposed upon the plaintiff. *Welch* v. *Sage*, 47 N. Y. 143; *Bank* v. *Hoge*, 35 N. Y. 65. Where a case has been disposed of by a misapplication of the law to the facts proved, caused by the attention of the court being diverted from the true questions by position of counsel, and injustice seems to have been done, a new trial should be granted. *Mandeville* v. *Marvin*, 30 Hun., 282; *Whittaker* v. *Canal Co.*, 3 N. Y. Supp. 576. The familiar rules applicable to commercial paper, in favor of one who pays full value before maturity, ought not to be overthrown without cogent reasons. In the absence of proof, there can be no inference that, when the plaintiff bought the note, he had any knowledge of any false representations to the defendant on the part of the company as to its solvency. *Stearns* v. *Gage*, 79 N. Y. 102; *Birdsall* v. *Russell*, 29 N. Y. 220–250. The judgment and order should be reversed, and a new trial granted, with costs to abide the event.