Herbert Levy, Appellant, v. Maurice Ralph Rosen, Appellee.

Gen. No. 40,516.

Opinion filed June 19, 1939.

A. Charles Lawrence, of Chicago, for appellant; James J. Lawrence, Max Frederick Goldberg and Sidney Levy, all of Chicago, of counsel.

George H. Kriete and Max W. Petacque, both of Chicago, for appellee; Theodore E. Rein, of Chicago, of counsel.

Mr. Justice O'Connor delivered the opinion of the court.

June 11, 1930, plaintiff brought an action of assumpsit against defendant to recover damages for a claimed breach of a contract by which defendant agreed to buy from plaintiff a seat on the Chicago Stock Exchange. There was a trial without a jury, a finding and judgment in defendant's favor and plaintiff appeals.

The record discloses that about September 20, 1929, plaintiff and defendant, who had known each other socially for some time, entered into an oral contract whereby plaintiff was to sell to defendant his seat on the Chicago Stock Exchange for $49,000, $25,000 to be paid when defendant was elected a member of the Stock Exchange and $24,000 to be paid in 12 monthly pay-

ments of $2,000 each, to be evidenced by defendant's notes secured by collateral. There was some delay on account of illness and business matters, but on October 14, 1929, defendant gave plaintiff his written application for membership in the Chicago Stock Exchange to be filed with the proper representative of the Exchange and it, together with plaintiff's application to transfer his membership, was filed with the secretary of the Exchange on the same day. At that time defendant turned over to plaintiff a memorandum of the list of mortgages which he submitted as collateral for payment of the $24,000. On the same day the secretary of the Exchange wrote defendant a letter requesting him to prepare in typewritten form and send to the Exchange, ''a complete history of your business connections from the time you entered into business to the present time,'' and on October 16 defendant complied with the request by sending the Exchange a letter giving the information. Two days prior to this, October 14, the Exchange ordered an investigation of defendant to be made by an agency, which reported to the Exchange, a part of which report was to the effect that defendant had become a citizen of the United States in April, 1929. This written report was excluded upon defendant's objection. October 26 defendant received a letter from the secretary of the Exchange requesting him to appear before the Committee on Admissions at a meeting to be held October 28 at 3:15 p. m. Four days before this letter was received by defendant there was a crash in the stock market and within ten days stocks declined about 50 per cent. About October 25 defendant advised plaintiff he would not go through with the deal and he failed to appear before the Committee on Admissions.

Defendant testified he was born in Constantinople, Turkey, and came to the United States in March, 1897, with his parents, sisters and brothers when he was four years old; the family went to Minnesota where they

resided for about four years and then moved to Milwaukee; in 1905, his father having died, he moved to Chicago with his mother where after a time he engaged in the real estate and mortgage business; that "I registered for the draft in 1917"; that he was married at the time but did not claim any exemption by reason of dependency. He further testified that he first discovered he was not a citizen of the United States in 1927; that at that time he applied for a passport as he wanted to leave the United States, and was told that unless he could prove he was born in this country or that his father was a citizen, he would have to obtain his own citizenship papers; that he could not produce his father's naturalization papers and then for the first time discovered he was not a citizen. On cross-examination he testified he voted in the primaries in 1928; that he applied for his first papers as a citizen in 1931 and received his final papers in October, 1935.

Defendant further testified that upon receipt of a letter on October 26 from the secretary of the Exchange advising him to appear before the Committee on Admissions, he went to the Stock Exchange and talked with the secretary who had sent the letter and asked if he could learn something about the workings of the Exchange, and was given a book containing such information; he took the book home over the week-end and read that no one could become a member unless he was a citizen of the United States; the following Monday he went to see plaintiff and told him what he had read in the book; that plaintiff asked him if he was a citizen and he answered, "No." Plaintiff then said, "Well, keep it quiet and I will get you in anyway." This statement was denied by plaintiff; and the secretary of the Exchange, Warren A. Marler, who wrote defendant the letter of October 25, testified he had posted defendant's name as a transferee and plaintiff's as transferor of the membership in question; he further testified that at no time had he had a conversa-

tion with defendant as to whether defendant should appear before the Committee on Admissions.

The constitution of the Chicago Stock Exchange, a voluntary unincorporated association, provides that "every applicant for membership must be a male citizen of the United States, at least 21 years old."

Since defendant repudiated the agreement plaintiff was not required to do anything further, but was entitled to sue upon the contract. *Weill v. American Metal Co.,* 182 Ill. 128; *Roehm v. Horst,* 178 U. S. 1; vol. 3, sec. 1303, p. 2354, Williston on Contracts.

Defendant contends that he "was not a citizen of the United States and hence plaintiff could not transfer or cause the transfer of a membership to him, nor could defendant receive such membership," therefore there is no liability on his part to respond in damages.

On the other side plaintiff's position is that, "The alleged alienism did not excuse performance by defendant"; that it "did not render the contract in point of fact impossible of performance." And counsel say, "The defendant could unquestionably have become a citizen and in that way obviated any obstacle whatsoever to admission. And even if this were not so, the Stock Exchange could have altered its regulations to permit him to become a member though he was an alien. The plaintiff offered to show that the Chicago Stock Exchange had, with knowledge of the facts, admitted aliens to membership," and in support of the proposition that "non-citizenship" fails to render the contract in fact impossible of performance counsel cite *Beebe v. Johnson,* 19 Wendell 500. In that case plaintiff averred that Johnson for a consideration of $5,000 conveyed to Beebe the sole and exclusive right to make, use and vend in Canada, in certain counties of New York and in other places a threshing machine patented to one Warren, and covenanted to perfect the patent right in England as soon as practicable and within a reasonable time, so as to secure to Beebe the entire control of the

Provinces of upper and lower Canada. After a reasonable time Johnson failed to perfect the patent right in England and secure to Beebe the exclusive right to sell the machine, etc., in Canada, and Beebe brought suit to recover damages. Beebe further averred in his declaration that Johnson and himself were citizens of the United States and therefore Johnson could not obtain either for himself or for Beebe from the Canadian authorities the exclusive right of selling the machine there, "and so, . . . Johnson had not kept his covenant." Defendant pleaded the general issue and gave notice of special matter to be proved on the trial. On the trial it was stipulated that the patent right could not be perfected in England because the authority to grant such letters patent was vested in the Canadian provinces, "and that in the provinces the exclusive right of vending improvements of this nature can be conferred only upon *a subject of Great Britain,* and a *resident of the provinces,* and that the *patentee,* the *plaintiff* and the *defendant,* are all citizens of the United States, and cannot become subjects of Great Britain short of a residence in the provinces of seven years." The jury returned a verdict for plaintiff for $601.23; judgment was entered on the verdict which on appeal was affirmed. In affirming the judgment the court said (p. 501): "It is supposed by the counsel for the defendant that a legal impossibility prevented the fulfilment of the covenant to perfect the patent right in England, so as to secure the monopoly of the Canadas," and therefore the obligation was dispensed with, so that the action could not be maintained. But the court held this contention untenable and continuing said (p. 502): "if the covenant be within the range of possibility, however absurd or improbable the idea of the execution of it may be, it will be upheld: as where one covenants it shall rain tomorrow, or that the Pope shall be at Westminster on a certain day. To bring the case within the rule of dispensation, it must appear

*that the thing to be done cannot by any means be accomplished;* for, if it is only improbable, or out of the power of the obligor, it is not in law deemed impossible. , . . Now it is clear that the fulfilment in this case cannot be considered an impossibility within the above exposition of the rule; because, for anything we know to the contrary, the exclusive right to make, use and vend the machine in the Canadas, might have been secured in England by an act of parliament or otherwise; at least, there is nothing in all this necessarily impossible. These provinces are a part of the British Empire, and subject to the power of the parliament at home; which body might very well grant the privilege the defendant covenanted to procure. Certainly we are unable to say the government cannot or would not *by any means* grant it.'' The court then refers to authorities and continues: ''if a party enter into an absolute contract without any qualification or exception, and receives from the party with whom he contracts the consideration of such engagement, he must abide by the contract, and either do the act or pay damages; his liability arising from his own direct and positive undertaking. . . .

''Again: It was said the contract was void, because it contemplated a renunciation of citizenship by the defendant. Whether, if the fact was admitted, the consequence would follow, we need not stop to consider, because it is very clear that no such step is necessarily embraced in the covenant. For aught we know, the patent might be procured without such renunciation; and if it were considered unlawful to contract for expatriation, inasmuch as this agreement does not necessarily contemplate it, we would be bound to hold that the defendant assumed to procure the patent without it. But even in England, the common law rule against the expatriation of the subject is so far modified that naturalization abroad for commercial purposes is recognized; and is of course lawful.'' To the same effect are

*Reid v. Alaska,* 43 Ore. 429 ; *Watson v. Blossom,* 4 N. Y. Supp. 489; *Wright v. Fullerton,* 60 Mo. App. 451; *Standard Oil Co. of New York v. Central Dredging Co.,* 225 App. Div. 407 (233 N. Y. Supp. 279).

In the *Reid* case where defendant contracted to sell to plaintiff salmon packed in Alaska to be "exactly like Puget Sound fancy Sockeye" he was unable to do so; yet the Supreme Court held he was liable "not, in fact, for not doing what cannot be done, but for undertaking and promising to do it." This was quoted from 2 Parsons on Contracts (7th ed.) * p. 673. In the *Watson* case (4 N. Y. Supp. 489) the New York court said: "As a rule, men of full age and understanding have the liberty of contracting, and their contracts, when entered into voluntarily, are ordinarily held binding, unless they are contrary to public policy, or in violation of some rule of law."

In the *Wright* case (60 Mo. App. 451) plaintiff and defendant owned premises abutting on a public alley and defendant contracted with plaintiff to construct a sewer at his own expense in the alley for the use of both premises ; the municipal authorities refused to permit this work to be done but laid the sewer in the alley and the cost was assessed against the abutting property owners. It was held that defendant was liable for damages for a breach of the contract; that where a contract is unconditional and its performance is possible, no intervening obstacle will relieve the obligor from the performance of it.

In the *Standard Oil Co.* case (225 App. Div. 407, 233 N. Y. Supp. 279) it was held that the difficulty or even improbability of accomplishing without great financial loss would not release an obligor from performing its contract, but that in order to establish a defense under such conditions defendant must prove that the thing could not by any means be effected.

We think the rule announced in the *Beebe* case (19 Wend. 500) has in recent years been somewhat relaxed.

Sections 454 and 456, Restatement of the Law. Section 454 defines impossibility as follows: "In the restatement of this subject impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." And in the comment following the section it is said: " 'Impossible' must be given a practical rather than a scientifically exact meaning. Impracticability rather than absolute impossibility is enough; and the words 'impossible' and 'impossibility' are used in the restatement of this subject with that meaning. Mere unanticipated difficulty, however, not amounting to impracticability is not within the scope of the definition."

And in cases growing out of the World War the rule announced in the *Reid* case was relaxed. *The Kronprinzessin Cecilie,* 244 U. S. 12.

But whether the rule is rigidly enforced as announced in the *Beebe* case, or is somewhat relaxed in the cases above cited, we think the defendant is liable, for the reason that defendant might have been admitted to membership in the Chicago Stock Exchange, as the offered evidence tended to show, without change of the constitution of the Exchange, or the constitution might have been amended by simple and speedy procedure. The constitution and by-laws of the Exchange provided for a governing committee of 15 members; that by a vote of two-thirds of the members of such committee any provision of the constitution or by-laws could be amended by such committee posting such amendment on the bulletin board of such Exchange and mailing a copy of the amendment to the members, and if such amendment were not disapproved by one-third of the members within one week, the amendment would become the law of the Exchange.

We think the overwhelming weight of the evidence shows that defendant's refusal to carry out his part of the contract was occasioned solely on the ground that

the stock market had dropped a great deal at about the time the contract was to be consummated, depreciating to a great extent the value of a seat on the Exchange, and that the fact defendant was not a citizen of the United States had nothing to do with his refusal to purchase the seat.

The learned trial judge in his opinion expressly stated that he decided the case against plaintiff on the question of law—the fact that defendant was an alien and therefore could not become a member of the Stock Exchange.

For the reasons above stated we hold this was error. And plaintiff contends that he is entitled to judgment in this court for $16,500, being the difference between the contract price of $49,000 and $32,500, the price at which plaintiff succeeded in selling the membership after the breach; that "In no event shall the liability of the defendant be less than $11,500, that being the difference between the contract price and the amount at which the highest sale took place next subsequent to the defendant's repudiation." There is no dispute as to the amount of plaintiff's damages, no evidence being offered to show that the figures above mentioned are not warranted by the evidence. In these circumstances there would be no purpose in remanding the cause.

For the reasons stated the judgment of the superior court of Cook county is reversed and judgment entered in this court in plaintiff's favor against defendant for $11,500.

*Judgment reversed and judgment in this court.*

McSurely, P. J., and Matchett, J., concur.