[No. B002670. Second Dist., Div. Five. Jan. 31, 1985.]

G. W. ANDERSEN CONSTRUCTION COMPANY,
Plaintiff and Appellant, v.
MARS SALES et al., Defendants and Respondents.

COUNSEL

Stanley Jensen for Plaintiff and Appellant.

Gold, Herscher, Marks & Pepper, Alan L. Pepper and Joshua L. Rosen for Defendants and Respondents.

OPINION

OSBORNE, J.*—Plaintiff construction company sued defendants after breach and repudiation of a contract by defendants. We consider the personal liability of an agent who failed to disclose the true name and corporate status of his principal. We also consider the effects of defendants' breach and repudiation together with later discovered obstacles to plaintiff's performance.

Plaintiff and appellant, G. W. Andersen Construction Company, is a California corporation and licensed general contractor. Jack Tickner, vice president, represented plaintiff in these transactions. Defendants are Mars Sales Company, a California corporation (Mars), Martin Smilo and Juliette Smilo. (Smilo will refer to Martin Smilo, unless otherwise indicated.) The Smilos are husband and wife, and the only officers and owners of Mars.

---

*Assigned by the Chairperson of the Judicial Council.

Between March 1 and April 9, 1982, plans for a building were drawn up and paid for. On Friday, June 18, 1982, after over two months of discussion, Smilo signed a $435,148 contract for plaintiff to construct the building, and gave plaintiff a $10,000 check as a down payment. By that evening, the Smilos had changed their mind. On Monday, June 21, 1982, Mrs. Smilo phoned to tell Tickner not to proceed on the contract, and called Mars' office manager to stop payment on the check and dictate a letter to Tickner.

Plaintiff sued the Smilos, learned that Mars was a corporation, and added the corporation as a defendant.

The plans had been drawn, and a proposed contract submitted to Smilo, by early April 1982. On May 5, 1982, the City of El Segundo passed an ordinance which, with certain exceptions, imposed a construction moratorium. Neither party was aware of the ordinance on June 18, 1982, when the contract was signed.

Defendants argued at the court trial that defendants' nonperformance was excused because the contract was unconscionable (Civ. Code, § 1670.5), because the contract was so vague as to be unascertainable since the price was subject to change (Civ. Code, § 1598), and because the contract was contingent on financing. The trial court rejected those defenses. These conclusions of the trial court were clearly supported by the evidence and there is no contention to the contrary.

As urged by defendants, the judge did find that the contract was with the corporation, but not the Smilos as individuals. He further found that while defendants had breached and repudiated the contract, their performance was excused because the effect of the May ordinance, coupled with a later ordinance, was to create an 11-month delay which would substantially increase the burden to defendants under the contract. Plaintiff appeals, contending that both of those rulings were erroneous.

### AGENT IS LIABLE BECAUSE OF PARTIALLY DISCLOSED PRINCIPAL

There were four documents, all signed by Smilo.

On March 1, 1982, an "AUTHORIZATION TO PREPARE PLANS FOR MARS SALES COMPANY" was signed "MARS MANUFACTURING CO., by Martin Smilo, Owner."

About April 9, 1982, Tickner delivered three contract documents to Smilo. On June 18, 1982, they were signed by Smilo. The "EXHIBIT 'A' SPEC-

IFICATIONS" and the "GENERAL CONDITIONS" were both signed "MARS SALES, By Martin Smilo, Authorized Representative." The "CONTRACT AGREEMENT" was signed "MARS SALES, By Martin Smilo."

Mars is not identified as a corporation anywhere on the documents.

Smilo testified that he and his wife personally owned all the real property on which Mars was located, including the land on which the new building was to be built, and leased it to Mars; if they had gone through with the contract, the Smilos would have bought the building personally and leased it to Mars; and Mars was not going to buy the building. Smilo acknowledged a personal worth of over a million dollars. There is little evidence of the worth of Mars, except that its bank balance was about $65,000.

█ The Restatement Second of Agency analyzes situations such as this in terms of whether the principal is disclosed, partially disclosed, or undisclosed. (Rest.2d Agency, § 4.) "Unless otherwise agreed, a person purporting to make a contract with another for a partially disclosed principal is a party to the contract." (Rest.2d Agency, § 321.) The principal is "partially disclosed" if the other party has notice that the agent is or may be acting for a principal, "but has no notice of the principal's identity." (Rest.2d Agency, § 4(2).)

█ Smilo signed in one place as "owner," in two places as "authorized representative," and in one place without any indication of status. If two signatures stated "as agent," the other party would still have notice "that the agent is or may be acting for a principal" even if agency status were omitted from another signature. However, for all that was apparent or known to plaintiff, Mars Sales was merely a fictitious name under which Smilo was doing business. Especially since Smilo signed in one place as "owner," plaintiff argues there was no notice that Smilo was signing for any principal other than himself. For further analysis, we assume the documents adequately revealed the fact of agency.

The problem in this case involves the disclosure of the identity and status of the principal. Three documents made up the contract and were signed on June 18, 1982. In each case, the "principal" is stated to be "Mars Sales," an apparently fictitious name. In fact, it is a fictitious name. Smilo was not sure of the name of the corporation. At his deposition, Smilo testified as follows:

"Question: Is the name of your company Mars Sales Company or Mars Sales Corporation?

"Answer: Well it's Mars Sales. Mars Sales.

"Question: Just Mars Sales?

"Answer: That's all.

"Question: Is that what you go by?

"Answer: That's right."

Smilo testified at trial that the true name of his corporation is "Mars Sales Company, Inc.," after some uncertainty and prompting. The checks and letterhead just say "Mars Sales" and do not show that it is a corporation. Nowhere was the true name disclosed. Even more important, nowhere was the status of the principal as a corporation disclosed. The clear and undisputed evidence in this case is that plaintiff had no knowledge any corporation was involved, much less Mars Sales Company, Inc.

In summary, the fact of agency was revealed, but the identity (true name and corporate status) of the principal was not. The only reference to a possible principal was by a trade name. Our attention has not been called to any similar California case. In other states, the general rule is that the use of a trade name is not sufficient disclosure of the identity of the principal to protect the agent from personal liability, unless the evidence establishes the other party knew the actual identity of the principal for whom the agent was acting from some source other than use of the trade name. (See Annot. (1944) 150 A.L.R. 1303.) The agent can protect himself from personal liability by clearly disclosing the fact of agency and the identity of his principal. Failing that, the other party is entitled to rely on the liability of the person with whom he dealt. The duty is on the agent to disclose, not on the other party to investigate.

As examples, the following trade names were not adequate disclosure of the identities of the principals to relieve the agents from liability. "Atlantic Block Company" did not disclose "Atlantic Building Block Co., Inc." in *Howell* v. *Smith* (1964) 261 N.C. 256 [134 S.E.2d 381]. "Blissville Distillery" did not disclose C. A. Steen & Co., proprietors of the distillery in *Cobb* v. *Knapp* (1877) 71 N.Y. 348 [27 Am. Rep. 51]. "Givner's Dry Cleaning" did not disclose agent Givner's wife doing business as Givner's Dry Cleaning in *Givner* v. *United States Hoffman Machinery Corp.* (1935) 49 Ohio App. 410 [3 Ohio Ops. 282, 197 N.E. 354]. "Campbell & Co." did not disclose agent Campbell's wife doing business as Campbell & Co. in *Amans* v. *Campbell* (1897) 70 Minn. 493 [73 N.W. 506, 68 Am. St. Rep. 547].

Defendants cite *Carlesimo* v. *Schwebel* (1948) 87 Cal.App.2d 482 [197 P.2d 167] as holding "that where the word 'by' appears, the contract reveals on its face that the other party was dealing with a corporation and that the corporation is liable and the agent is not." Defendants confuse different issues. The identity and corporate status in *Carlesimo* were disclosed on the door of the office and on the contract in the printed letterhead and the signature block. The issue in *Carlesimo* was whether there was disclosure that Schwebel was signing as an agent and not as a principal, since he had omitted "by" from the signature block. The court held that there was sufficient evidence to support the finding that Schwebel signed as agent.

The fact of agency and the identity of the principal may both be disclosed to or known by the other party other than from the contract itself. But as noted in this case, plaintiff did not know the name or corporate status of the principal.

Under the Restatement test, the principal was partially disclosed, and Smilo is therefore liable as a party. (Rest.2d Agency, §§ 4, 321, com. b, p. 71.) (Mars would still be liable since the principal was not excluded as a party by the terms of the instrument or by any agreement of the parties. See Rest.2d Agency, § 149.)

According to Mr. Witkin, California requirements for disclosure are more strict than those of the Restatement. "The California cases do not employ the Restatement analysis, and appear to hold the agent liable, regardless of his disclosure of the fact of agency, unless the *name of the principal* is disclosed so as to make it appear on the face of the instrument that the parties intended to bind the principal and not the agent. [Citations.]" (1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 184, p. 780.) We question the implication that the name of the principal must appear on the face of the contract to relieve the agent from liability, where the other party knows the name and corporate status of the principal other than from the face of the contract. We need not consider that question in this case, since Smilo is liable even under the Restatement analysis which is more favorable to him.

Under either analysis, Smilo is a party and is individually liable as well. That result can hardly be considered inequitable in this case. Smilo is not some impecunious hireling who was faithfully dealing for his employer but is liable on a contract because he inadvertently omitted "Inc." from the name of the corporation he represented. Smilo is, and signed as, the owner of Mars. Smilo owned the land being built on, and testified he intended to own the building and lease it to the corporation. (Cf. *Stevens* v. *Graf* (1959) 358 Mich. 122 [99 N.W.2d 356].)

■ There are not similar acts as agent or principal by Mrs. Smilo in the execution of the contract to require her to be found individually liable.

Plaintiff alleged that a unity of ownership existed between the Smilos and Mars such that each was the alter ego of the other, that the Smilos did not inform plaintiff that Mars was a corporation, and that to permit the Smilos to escape personal liability would sanction fraud and promote injustice. Plaintiff apparently sought to have the court "pierce the corporate veil" or disregard the corporate entity. (See 6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, §§ 5-6.) In view of its ultimate rulings, we must infer that the trial court found insufficient basis to disregard the corporate entity. The record does not compel a conclusion that recognizing the corporate entity will result in fraud or injustice, especially since Mr. Smilo is individually liable for other reasons. The implied finding must be upheld, and therefore Mrs. Smilo cannot be found individually liable on that basis.

The findings that Mars is liable and Mrs. Smilo is not individually liable are upheld. ■ The finding that Mr. Smilo is not liable as a party is not supported by the evidence; as a matter of law, it is contrary to the clear and undisputed evidence.

### DEFENDANTS ARE NOT DISCHARGED BY TEMPORARY IMPRACTICABILITY FOR PLAINTIFF TO PERFORM

■ The trial court, during trial, recognized that defendants were attempting to establish a defense of "legal impossibility." The Restatement of Contracts section 462 used the phrase "temporary impossibility." The Restatement Second of Contracts section 269 uses the phrase "temporary impracticability." The trial court expressed its finding in terms of "delay." Though not necessarily identical in all situations, we will use the three terms interchangeably.

The Smilos breached the contract within three days after signing it by stopping payment on the check for the $10,000 down payment, and they repudiated the contract by a telephone call and a letter telling plaintiff not to do anything on the contract.

The sole ground on which the trial court found defendants were excused from performance was that the 11-month delay caused by a building moratorium would substantially increase the burden to defendants under the contract.

Plaintiff contends that there is not substantial evidence to support the conclusion that defendants were excused, and indeed that the evidence establishes to the contrary as a matter of law.

The delay alone does not excuse defendants from performance. First, the defendants *wanted* to delay the construction for their own reasons. Second, it is clear from the contract and surrounding circumstances that time was not of the essence to defendants. (See 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 585, p. 502.) Third, as we will note later, the contract included provisions for dealing with starting delays of over six months caused by the owner or a governmental agency. In this case, an 11-month delay alone does not discharge defendants' duty. (Cf. *Dorn* v. *Goetz* (1948) 85 Cal.App.2d 407 [193 P.2d 121].) We turn then to delay coupled with risk of increased price, as contended by defendants and found by the trial court.

Defendants urge that the case is controlled by the Restatement of Contracts section 462 quoted in *Oosten* v. *Hay Haulers Etc. Union* (1955) 45 Cal.2d 784, 788-789 [291 P.2d 17]: "Temporary impossibility of the character which, if it should become permanent, would discharge a promisor's entire contractual duty, operates as a permanent discharge if performance after the impossibility ceases would impose a substantially greater burden upon the promisor; otherwise the duty is suspended while the impossibility exists." (The current statement of the rule regarding temporary impracticability of performance is section 269 of the Restatement Second of Contracts.)

Is there substantial evidence that the delay "would impose a substantially greater burden" upon defendants such that it would discharge their duty to perform? The trial court stated that the "delay imposed a risk that the contract price would be increased" under the contract. In support of that finding, defendants point to the testimony of a witness that in the building industry, prices sometimes change rather drastically. The only evidence hinting at an actual price increase was that building costs might have increased less than one-half a percent between March of 1982 and June of 1982, *before* the contract was signed.

This evidence cannot sustain the trial court's finding for several reasons. First, as noted earlier, the defendants wanted to delay construction, hoping that lower interest rates would become available and reduce their financing costs. Second, the test is not the *risk* of a substantially greater burden, but the *fact* of an *actual* substantially greater burden. The trial of this case was nine months after the contract was signed. There was no evidence of any price increase during that time. Third, even if the test were "risk," or if there had been evidence of actual increases in building costs, it would have been of no avail to defendants. "The rule stated in this Section [regarding temporary impracticability] is, of course, subject to contrary agreement." (Rest.2d Contracts, § 269, com. a, p. 349.) In paragraph No. 3 of the

"GENERAL CONDITIONS" the parties agreed: "Owner agrees to reimburse Contractor for any increase in labor and material after six months (6) from signing of contract, if delay in starting of construction is caused by Owner and/or governmental agency." In summary, the finding of discharge of defendants' duty to perform because the delay imposed a risk of increased costs cannot be sustained.

Further, aside from evidentiary problems, the legal analysis urged by defendants is erroneous, because it confuses the tests for different promisors. There was no governmental delay (temporary impossibility or impracticability) as to *defendants'* performance. The defendants were required to make a down payment, but stopped payment on the check and thereby breached the contract. There was no governmental influence on that breach or defendants' repudiation. The temporary impossibility which the court found, and which we assume for this section of analysis, only affected the *plaintiff's* ability to perform, i.e., to build. The effect of that temporary impossibility was to extend the plaintiff's time to perform. Plaintiff's duty to build would not be discharged unless the delayed performance would be materially more burdensome to plaintiff. (Rest.2d Contracts, § 269.) The delay would not excuse plaintiff (and indirectly defendants) because the contract required defendants to pay any increased cost, and delayed performance would not be materially more burdensome to plaintiff. Section 269 applies only to the party whose duty is adversely affected by the delay (plaintiff). The effect of the delay on the other party (defendants) is governed by other sections. (Rest.2d Contracts, § 269, com. a, pp. 349-350.)

As stated above, plaintiff's actual or prospective failure to perform (during the delay) would not be a breach, because its duty to perform would be suspended during the temporary impracticability. (Rest.2d Contracts, § 269.) However, plaintiff's actual justified failure to perform (to build) operates as the nonoccurrence of a condition which would suspend defendants' duty (to pay, except for the down payment) until plaintiff can and does perform (build). (Rest.2d Contracts, §§ 267, 237, 225(1).) The same result would occur from a prospective justified failure to perform. (Rest.2d Contracts, §§ 268, 251(1).) But defendants' duty, though suspended, would not be discharged unless plaintiff repudiated its duty, or plaintiff's performance is not merely delayed but can no longer occur. (Rest.2d Contracts, §§ 253(2), 225(2).) Performance of plaintiff's duty after an 11-month delay would not have been unreasonable under the circumstances of this case, where defendants wanted a delay, and the contract expressly provided for the consequences of more than six months delay. (See Rest.2d Contracts, § 204.)

Thus, the governmentally imposed delay we assume for analysis of this section, is not sufficient to discharge defendants' duty. The temporary im-

practicability would suspend plaintiff's duty and therefore defendants' later duties which were conditioned upon plaintiff's prior performance. But the delay (even with some risk of price increases) would not discharge defendants' duty unless plaintiff repudiated or plaintiff's performance became permanently impossible. Plaintiff did not repudiate, so we turn to the issue of permanent impossibility.

### DEFENDANTS ARE NOT DISCHARGED BY PERMANENT IMPOSSIBILITY

█ Even where defendants have repudiated a contract without any justification or excuse, plaintiff cannot recover damages if it would have been permanently impossible for plaintiff to perform even if defendants had not repudiated. Defendants' excuse is failure of consideration. "Although one who has contracted to buy an automobile and to pay the price for it may be morally blameworthy if he repudiates his contract in ignorance of the prior destruction of the automobile, the seller has suffered no legal injury because he could not have carried out the contract on his own part . . . ." (6 Williston on Contracts (3d ed. 1962) § 839.) "So where a plaintiff has been prevented by a supervening law from fulfilling his contract, he is not entitled to performance from the other contracting party." (6 Williston on Contracts (3d ed. 1962) § 838; accord, 4 Corbin on Contracts (1951) § 978.) The Restatement sections cited above lead to the same result, i.e., defendants' duty is discharged because of the nonoccurrence of a condition to defendants' duty, if plaintiff's performance was permanently, not temporarily, impossible.

Plaintiff's performance was not impossible at the time the contract was signed on June 18, 1982. Ordinance No. 1023, adopted May 4, 1982, was merely an interim ordinance which would have prevented the start of construction for about two and one-half months. The effect, if any, on the performance of the contract would have been negligible. Nor did ordinance No. 1025, adopted in July 1982, create any permanent impossibility. It continued the moratorium another eight months, and, at most, would have delayed construction until May 1983.

Ordinance No. 1038 was adopted in December 1982. That ordinance provides development standards for property zoned M-1 which would apply after the moratorium expired in May 1983. However, those requirements would not apply to Smilos' property because it was included in an area which ordinance No. 1038 rezoned to C-M effective in either January or May of 1983. Ordinance No. 1038 does not establish permanent impossibility for plaintiff to perform.

No other ordinances were presented in evidence. Plaintiff argues that construction was not barred after ordinance No. 1038, and one might infer that from the trial court's finding only of delay rather than permanent impossibility. However, we need not decide whether construction was made possible after May 1983, some two months after the trial in this case.

Even if construction of the building as contracted was barred after May 1983, defendants had other duties which they did not perform. The Restatement Second of Contracts section 264 governs impracticability of performance where prevented by governmental regulation or order, including a municipal ordinance. Comment b, at page 333, states: "It is not necessary that the regulation or order be valid, but a party who seeks to justify his nonperformance under this Section must have observed the duty of good faith and fair dealing imposed by § 205 in attempting, where appropriate, to avoid its application." Ordinance No. 1025, which extended the moratorium, provided an exception whereby a building of that size could be built with the specific approval of the city council.

El Segundo's ordinance code also provides a procedure whereby a variance can be granted permitting construction without compliance with the code, including requirements such as setbacks, parking, open space, etc. There is authority that defendants would be required to apply for such a variance if some ordinance code provision did prevent construction of the building after the moratorium expired. (*Pennsylvania State Shopping Plazas, Inc.* v. *Olive* (1961) 202 Va. 862 [120 S.E.2d 372, 88 A.L.R.2d 1016]; *Kiyoichi Fujikawa* v. *Sunrise Soda Water Works Co.* (9th Cir. 1946) 158 F.2d 490, cert. den., 331 U.S. 832 [91 L.Ed. 1846, 67 S.Ct. 1511]; *McNally* v. *Moser* (1956) 210 Md. 127 [122 A.2d 555, 60 A.L.R.2d 388]; see also *Stockburger* v. *Dolan* (1939) 14 Cal.2d 313 [94 P.2d 33, 128 A.L.R. 83]; *Levy* v. *Rosen* (1939) 300 Ill.App. 523 [21 N.E.2d 653].) Certainly defendants' duty of good faith and fair dealing required them to cooperate in seeking an exception from the city council during the moratorium as expressly provided by the moratorium ordinance. Having failed to do so because they did not want plaintiff to go ahead with the construction, defendants put it beyond plaintiff's power to perform. Having failed to avail themselves of methods provided for relief from ordinance restrictions, defendants cannot be heard to complain that the ordinances made construction permanently impossible.

Defendants contend that Nicholas Romaniello, the director of planning for El Segundo, testified that the building could not be built. Plaintiff contends that the testimony was improperly received over repeated objections that it was incompetent as conclusions of law and was speculative regarding what the city council would do in granting exceptions or variances. We

need not resolve those evidentiary rulings. The trial court did not find permanent impossibility even with that evidence. Even if some ordinance not specified in the evidence would prevent building after May of 1983, defendants had a duty to cooperate and seek an exception during the moratorium, before trial.

## OTHER MATTERS

■ Defendants contend that even if their duty was not discharged under the doctrine of temporary impossibility, it was discharged as a result of mistake of law or commercial frustration. These contentions are of no avail in these circumstances. The trial court did not make such findings, and we cannot say those defenses were proved. More fundamentally, they were not pleaded. A denial does not raise, and the answer must affirmatively allege, mistake or defendants' excuse such as failure of consideration. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 911, 913; see also Rest.2d Contracts, §§ 264-265; *Kennedy* v. *Reece* (1964) 225 Cal.App.2d 717, 726 [37 Cal.Rptr. 708].) Finally, on the merits, those defenses must fail. They are based on the assumption of permanent impossibility which has already been found unavailing in this case.

Defendants' unjustified breach by nonperformance (stopping payment on the check) plus repudiation makes defendants liable for damages for total breach of the contract, and discharges plaintiff's remaining duties. (Rest.2d Contracts, §§ 243, 225(2).)

The duties of Mars and Smilo were not discharged, and they are liable for damages for total breach.

Plaintiff urges that on reversal, this court should fix damages for the breach of contract at $97,040. While plaintiff presented evidence to that effect, the trial court made no finding because it found defendants not liable. That is a determination which must initially be made by the trial court.

## DISPOSITION

The judgment in favor of Juliette Smilo is affirmed. The judgment in favor of Mars and Martin Smilo is reversed. The case is remanded for the trial court to determine the amount of profit plaintiff would have made if per-

mitted to construct the building, and attorney fees during trial and appeal, and to enter judgment for plaintiff against Mars and Martin Smilo.

Feinerman, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied February 28, 1985.