In re **KAISER STEEL CORPORATION**, Debtor.

**KAISER STEEL CORPORATION**, Plaintiff,

v.

Irwin L. **JACOBS**, et al., Defendants.

**Bankruptcy No. 87 B 1552 E. Adv. No. 87 E 137.**

United States Bankruptcy Court, D. Colorado.

Sept. 25, 1989.

See also, Bkrtcy., 95 B.R. 782.

Susan M. Freeman, Lewis & Roca, Phoenix, Ariz., H. Thomas Coghill, Coghill & Goodspeed, P.C., Denver, Colo., for plaintiff, Kaiser Steel Corp.

Thomas H. Young, Rothgerber, Appel, Powers & Johnson, Denver, Colo., for defendant, Charles Schwab & Co., Inc.

David I. Blejwas, Hahn & Hessen, New York City, Richard Vermeire, Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colo., for Bear Stearns & Co., Inc., et al.

Robert A. Zupkus, Zupkus & Ayd, P.C., Denver, Colo., for AmSouth Bank, N.A.

William D. Nelson, Denver, Colo., for Boettcher & Co., Inc.

J. Michael Morgan, Lohf, Shaiman & Ross, Denver, Colo., Howard, Darby & Levin, New York City, for Brown Bros. Harriman & Co.

James J. Moyland, James J. Moyland & Associates, Chicago, Ill., for Burke, Christensen, & Lewis Securities, Inc.

John S. Lutz, Salie B. O'Malley, Kelly, Stansfield & O'Donnell, Denver, Colo., for Chicago Corp., Piper, Jaffray & Hopwood, Spear, Leeds & Kellogg and SLK–SEG, and Tweedy Brown Clearing Corp.

Barry L. Wilkie, Shaw, Spangler & Roth, Denver, Colo., Susan E. Harkins, Cahill Gordon & Reindel, New York City, for Dillon, Read & Co. Inc.

David B. Rosenman, Lewis, D'Amato, Brisbois, Bisgaard, for Bank of New England and Bank of New England–West.

John B. Moorhead, Baker & Hostetler, Denver, Colo., for Drexel Burnham Lambert, Inc.

Richard S. Vermeire, Dwight K. Shellman, III, Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colo., for Edward D. Jones & Co., Inc., Fahnestock & Co., Edward A. Viner & Co., First Albany Corp., Tucker, Anthony & R.L. Day, Inc., Thomson McKinnon & Co., Inc.

Richard S. Vermeire, Dwight K. Shellman, III, Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colo., Karen Johnson–McKewan, Brobeck, Phleger & Harrison, San Francisco, Cal., for Wells Fargo and Crocker Nat. Bank.

Richard S. Vermeire, Dwight K. Shellman, III, Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colo., Jeffrey A. Kehl, McGuire & Tiernan, New York City, for Kellner, DiLEO & Co., Inc.

John B. Moorhead, Baker & Hostetler, Denver, Colo., for Mabon, Nugent & Co.

Michael Heitner, Herrick, Feinstein, New York City, for Evans & Co., Inc.

Michael H. Du Boff, Salon, Marrow & Dyckman, New York City, for Ernst & Co.

Paul L. Matecki, Boca Raton, Fla., for JW Charles Securities, Inc.

Robert Swanson, Hamilton, Myer, Swanson, Faatz & Clark, Denver, Colo., for Josephthal & Co. Inc. and Herzfeld & Stern, nka JII Securities, Inc.

Edwin G. Perlmutter, M. Frances Cetrulo, Berenbaum & Weinshienk, Denver, Colo., for Nat. Bank of Detroit, May Financial Corp., Manufacturers and Traders Trust Co., and Bankers Trust of New York.

Michael H. Berger, Waldbaum, Corn, Koff and Berger, Denver, Colo., for National Financial Services Corp.

William C. Roush, Freud, Markus, Slavin & Galgan, Troy, Mich., for Roney & Co.

Jacques A. Machol, Jr., Jacques A. Machol, III, Machol and Machol, Denver, Colo., for U.S. Trust Co. of New York.

Jay G. Epstein, Shearman & Sterling, New York City, for Lewco Securities Corp.

Douglas R. Ferguson, Hopper, Kanouff, Smith, Peryam and Terry, Denver, Colo., for Olde Discount Corp.

Luke J. Danielson, Laurie K. Rottersman, Gersh & Danielson, Denver, Colo., for Stifel Nicolaus & Co.

Dennis C. Brown, Munger, Tolles & Olson, Los Angeles, Cal., Robert F. Hill, Hill & Robbins, Denver, Colo., for Pacific & Co.

Martin P. Unger, Gaston & Snow, New York City, James A. Shpall, Wolf & Slatkin, Denver, Colo., for Securities Settlement Corp.

Mark Grobmyer, Arnold, Grobmyer & Haley, Little Rock, Ark., Harold A. Feder, Feder, Morris, Tamblyn & Goldstein, Denver, Colo., for Stephens, Inc.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

CHARLES E. MATHESON, Chief Judge.

This matter comes before the Court on the Motion for Summary Judgment and supporting brief ("Motion") filed by Charles Schwab & Co., Inc. ("Schwab") and responses thereto filed by Kaiser Steel Corporation ("Kaiser"). A number of other Defendants have filed simple pleadings merely stating their joinder in the substance of Schwab's Motion and Reply. Others, however, have filed briefs joining in the substance of Schwab's Motion and supplementing it with additional legal argument.

## I. BACKGROUND AND PROCEDURE

On February 27, 1987, Kaiser commenced this litigation seeking to recover from certain defendants funds transferred in early 1984 and thereafter as part of the leveraged buyout ("LBO") of Kaiser which

occurred in 1984.[1] In September, 1987 Kaiser amended its complaint to add as defendants over 150 brokerage houses. The Amended Complaint is brought pursuant to 11 U.S.C. §§ 541, 544, 548 and 550; Cal.Civil Code § 3439.01 et seq. (1985); and common law. The defendants include: (1) several who attempted a hostile takeover of Kaiser in advance of the LBO; (2) nominees of clearing houses and clearing houses; (3) discount brokers; and (4) full-service brokerage houses. Schwab is and was a discount securities broker at all times relevant to this matter.

### A.  *Arguments of the Parties.*

Schwab, in its Motion, asserts that because it is a discount securities broker and does not generally buy and sell securities for its own account nor act as a market-maker in any security, it should be found to be a "mere conduit" and not subject to liability as an initial transferee within the context of 11 U.S.C. § 550. Schwab also asserts that while it held securities in "street name"[2] it did so solely as a nominee for the beneficial owners of the securities, its customers. Schwab argues alternatively that if the Court construes the language of 11 U.S.C. § 550 strictly and finds that Schwab is a transferee, the Court should exercise its equitable powers granted under 11 U.S.C. § 105 to prevent recovery from Schwab, an innocent party who derived nothing from the LBO.

Bear Stearns & Co., Inc., Cowen & Co., Inc., Doft & Co., Inc., L.F. Rothschild & Co., Inc., Unterberg, Towbin, Shearson Lehman Brothers/American Express, Inc. and Smith, Barney, Harris, Upham & Co., Inc. ("Bear Defendants") have filed a separate brief joining in Schwab's Motion ("Bear Joinder"). The majority of joining pleadings filed by other defendants have echoed the arguments presented by Schwab. The Bear Defendants, however, have raised a novel argument. They argue the applicability of 11 U.S.C. § 546(e) which limits the trustee's ability to recover either a margin or settlement payment from a broker.

Kaiser, in response, argues that Schwab is a "transferee" within the meaning of § 550 as follows: (1) Schwab had sufficient dominion and control over the LBO funds, not only because Schwab held the shares in "street name," but also because Schwab and its beneficial owners had agreements whereby the beneficial owners granted Schwab a lien against the LBO funds it received from one of the clearing houses and the disbursing agent; (2) the Court should construe literally the language of section 550 and refrain from "equitable redrafting;" and (3) Schwab cannot rely on its agency relationship as a defense to its liability when its principals were undisclosed at the time of the transfer and when Kaiser dealt with Schwab directly.

In their Reply to the Bear Joinder, Kaiser contends that section 546(e) is inapplica-

---

1.  On February 29, 1984, all stockholders of Kaiser were required to tender their shares to Kaiser in exchange for the right to receive $22.00 in cash plus one share of Series A preferred stock and one share of Series B preferred stock in the surviving entity.

2.  The term refers to the practice of registering securities in other than the name of the beneficial owner, a device used most frequently by banks or brokerage firms as owners of record on behalf of the individual or institutional investors. *In re Franklin National Bank Securities Litigation,* 574 F.2d 662, 664 n. 2 (2nd Cir.1978), *citing Security and Exchange Commission,* Final Report to Congress on The Practice of Recording the Ownership of Securities and the Records of the Issuer in Other Than the Name of the Beneficial Owner of Such Security [Street Name Study; Final Report] (December 3, 1976), Fed. Sec.L.Rep. (CCH) No. 672 (1976), at pg. 1; and

*Securities and Exchange Commission,* Preliminary Report of December 4, 1975, on The Practice of Recording the Ownership of Securities in the Records of the Issuer in Other than the Name of the Beneficial Owner of Such Securities [Street Name Study; Preliminary Report] (December 4, 1975), Fed.Sec.L.Rep. (CCH) No. 619 (1975), at pgs. 1–2. A principal purpose of such registration is to facilitate transfer of the securities. An additional purpose is confidentiality on the part of the beneficial owner, but also on the part of his broker who seeks to conceal his customer's identity from other brokers who will learn it in the settlement of trades. *Blanc and Quinn,* The Right of Access to Record Holder and Other Shareholder Listings, Practicing Law Institute (1987), PLI Order No. 84–6810; *accord Fradkin v. Ernst,* 571 F.Supp. 829, 839, n. 16 (N.D.Ohio, E.Div.1983).

ble because section 546(e) does not apply unless the debtor is a stock or commodities broker. If it does apply, the LBO Consideration is not a settlement payment, but payment for a mandatory redemption of stock. Kaiser also urges that the application of section 546(e), in this instance, would lead to the absurd result of precluding the avoidance of any transfers made in the course of a leveraged buyout that passes through securities' brokers or clearing houses.

## II.  UNDISPUTED FACTS

The parties have filed a Joint Statement of Facts concerning Schwab's Motion ("Joint Statement of Facts"). The following relevant and uncontested facts are taken from the Joint Statement of Facts and briefs of the parties. They are as follows:

### A.  *Schwab.*

1.  Schwab is and was a discount securities broker which executes securities' transactions on an agency basis for its customers.

2.  Schwab has a corporate policy against recommending specific securities and offering investment and voting advice to its customers.

3.  Schwab has represented that during the period of time in question (i.e., prior to March 1986), it was using account agreements with its customers in one or more of the forms attached as Exhibits 1–16 to the Joint Statement of Facts.

4.  All of the customer agreements provide that Schwab does not act as an investment counselor or advisor.

5.  All of the customer agreements used by Schwab provide that all securities and money held in Schwab accounts are subject to a lien for the discharge of all customer indebtedness to Schwab.

6.  Each Schwab margin and short account agreement authorizes Schwab to pledge and repledge all securities in Schwab's possession held for the account of a customer for the amount due Schwab from the customer or for a greater sum.[3]

7.  Schwab executes trades on a principal basis in certain limited circumstances.[4] It does not, however, generally buy and sell securities for its own account and does not act as a marketmaker in any security.

8.  Schwab owns securities as a nominee for its customers, the beneficial owners of the securities.

### B.  *1984 Kaiser LBO.*

9.  Kaiser prepared and issued a proxy statement and prospectus to its shareholders on December 9, 1983, advising them of the annual shareholders' meeting to be held on January 18, 1984, and the proposed LBO transaction.

10.  At the shareholders' meeting on January 18, 1984, the majority of shareholders of Kaiser common stock approved the proposed LBO. As a result, on February 29, 1984, all shareholders, including Schwab's customers, were required to tender all of their shares to Kaiser in exchange for the right to receive for each share $22.00 in cash plus one share of Series A preferred stock and one share Series B preferred stock in the surviving entity. ("LBO Consideration").

11.  Bank of America agreed to be the Kaiser "disbursing" agent for the 1984 LBO transaction. Bank of America was authorized to obtain the return of Kaiser common stock and to distribute the LBO Consideration. Bank of America was also to act as registrar for the new preferred stock.

### C.  *Dividends.*

12.  Schwab's records reflect that on the date indicated it credited the following

---

**3.**  *See infra* note 6.

**4.**  In an "agency" trade, the broker purchases a security at its customer's order and charges the customer a commission for executing the trade. The broker acts as a principal when it sells the customer a security owned by the broker. In a "principal" trade the broker does not charge a commission but receives its compensation (if any) by selling the stock at a price in excess of the price paid by the broker when it acquired the stock (referred to in the industry as the "mark up.")

amounts as dividends on the Series A and Series B stock to its customers:

| DATE | AMOUNT |
|---|---|
| May 15, 1984 | $ 7,828.75 |
| August 15, 1984 | 20,809.11 |
| November 15, 1984 | 30,791.06 |
| February 15, 1985 | 30,002.03 |
| May 15, 1985 | 33,020.62 |
| August 15, 1985 | 31,062.43 |
| November 15, 1985 | 33,249.54 |
| February 15, 1986 | 25,864.74 |

### III. ISSUE

The issue presented by these facts is whether Schwab, and other discount brokers who held stock of Kaiser in "street name", can be held liable as an initial transferee of the LBO Consideration within the meaning of section 550 when it is known in the industry that such brokers *generally* do not trade on their own account.

### IV. ANALYSIS AND CONCLUSIONS OF LAW

In order to prevail, Kaiser must ultimately prove the elements of sections 544 and 548 and the California fraudulent conveyance statutes. The question which then arises is, from whom can Kaiser recover under section 550? 11 U.S.C. § 550(a) states in pertinent part:

Except as otherwise provided in this section, ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) *the initial transferee of such transfer* or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee. (Emphasis added).

The Bankruptcy Code does not define "transferee." Thus, courts have grappled with this concept particularly where the defendant is an "innocent" link in the commercial chain. *In re Cash Currency Exchange, Inc.*, 1987 WL 46369 (Bankr.N.D. Ill. Sept. 25, 1987) (No. 85A145, 85A146). As a result, courts have devised the "mere" or "commercial conduit" theory to determine whether an entity which receives

a transfer is a "transferee". The phrase "mere conduit", or some variation thereof, has been coined by various courts to characterize those "innocent" entities which are only agents or passthroughs of the transferee. Before delving into a critique of this theory, a review of the significant cases which have invoked the "mere conduit" theory is instructive, not only to discern whether any definition of "transferee" can be gleaned, but also to gain an understanding of this theory.

The seminal case is *In re Fabric Buys of Jericho, Inc.* 33 B.R. 334 (Bankr.S.D.N.Y. 1983). It is also one of the first cases in which the court utilized the phrase "mere conduit." [5] In that case the Court found that a law firm was not liable as an initial transferee for the funds which it received from the opposing party to settle a dispute with one of the law firm's clients. The language from the *Fabric Buys* case which is particularly enlightening is as follows:

The Hopgood firm acted as a mere conduit of funds from Fabric Buys to Unitrac (its client). As one commentator states, *an initial transferee is one who deals directly with the debtor.* 4 Collier on Bankruptcy ¶ 550.01, at 550–3 (15th ed. 1983). Here Unitrac had the direct business dealings with Fabric Buys that gave rise to the debt, subsequent suit, and the allegedly preferential payment. That such amount was funneled through the escrow account does not make Unitrac's lawyer an initial transferee. *Id.* at 337.

The *Fabric Buys* court also intimated that the court could exercise equitable powers to achieve a different result:

*Even if* the Hopgood firm were deemed an initial transferee, the circumstances of this case, as stated above, would permit this Court to exercise its equitable discretion and prevent the Trustee from recovering a preference from the Hopgood firm. As one commentator has stated:

In some circumstances, a literal application of section 550(a) would permit the Trustee to recover from a party

---

5. *See infra* note 6.

who is innocent of wrongdoing and deserves protection. In such circumstances the bankruptcy court should exercise its discretion to use its equitable powers under section 105(a) and 28 U.S.C. § 1481 to prevent an inequitable result.... *Ibid, citing 4 Collier on Bankruptcy* ¶ 550.02, at 550–7 (15th ed. 1983).

*Id.* at 337.

Although the court did not invoke its equitable powers, it remarked: "Hopgood acted as the *agent* of Unitrac, *a mere conduit* of funds from Fabric Buys to Unitrac, such funds passing through an escrow account maintained by the Hopgood firm for client monies alone." *Id.*

The next in this line of cases is *In re Black & Geddes, Inc.*, 59 B.R. 873 (Bankr. S.D.N.Y.1986). In *In re Black & Geddes* the Chapter 7 trustee of a freight forwarder brought an action against a steamship agency acting on behalf of a common carrier to collect payment for the freight due on the carrier's bill of lading. The trustee sought to recover the payment made to the agency as a preference. It was undisputed that the bill of lading for the shipment in question was issued by the common carrier. The steamship asserted as a defense that it was only an agent for a disclosed principal, the common carrier.

The court found first that the trustee could not recover a preference from the steamship agency because there was no antecedent debt existent between the debtor and the agency. Next, the court disagreed with the trustee that, regardless of that fact, section 550 permitted recovery from the agency as an initial transferee. The court relied on the holding of *In re Fabric Buys of Jericho, Inc.* that "an entity that acts as a mere conduit of funds is not an initial transferee within the ambit of section 550 and no recovery may be had from the entity." *Id.* at 875, *citing accord, 4 Collier on Bankruptcy* (15th ed. 1985) ¶ 550.02 at 550–7 to 550–8.[6]

The first district court to visit this issue was the District Court for the Southern District of Florida.[7] In *In re Colombian Coffee Co., Inc.*, 75 B.R. 177 (S.D.Fla.1987), the trustee of the debtor corporation sought to recover funds, allegedly constituting a fraudulent transfer, from a bank where a second corporation maintained its account and into which the funds were deposited via a wire transfer.

The district court was persuaded by the reasoning in *In re Fabric Buys* and *In re Black & Geddes* and the application of the "commercial conduit" theory under these circumstances. *Id.* at 178. This court, like the *Black & Geddes* court, cited Judge Cardozo's discussion of the conduit theory

---

**6.** Despite its holding the court noted in a footnote that:

In an appropriate case, there may be the possibility of a recovery from an entity as an initial transferee under Code § 550 even though that entity did not receive a preference under Code § 547. That situation would arise, for example, in this case if Nedlloyd [the steamship agency] had not yet made payment over to Hoegh [the common carrier] at the time the case was commenced and arguably could exist relative to the amount retained as a commission. Nedlloyd would then have been holding funds which could be recovered by the estate if it could be shown that payment to Hoegh would be a preferential transfer. Thus, this court finds continued vitality in Judge Cardozo's discussion in *Carson v. Federal Reserve Bank*, 254 N.Y. 218, 235–36, 172 N.E. 475 (1930) ("The person to be charged with liability, if he has parted before the bankruptcy with title and possession, *must have been more than a mere custodian, an intermediary or conduit between the*

*bankrupt and the creditor. Directly or indirectly he must have had a beneficial interest in the preference to be avoided, the thing to be reclaimed*"). *Id.* at 875 n. 4.

**7.** The District Court for the District of Columbia tacitly recognized the innocent transferee concept only a couple of months before this. *In re Auto–Pak, Inc.*, 73 B.R. 52 (D.D.C.1987). In that case the court, however, rested its decision on 11 U.S.C. § 550(b):

The crux of this case concerns whether the IRS should be held liable under § 550(a)(1) or *protected under* § 550(b) ... It would defy logic to hold an *innocent and mediate* party such as the IRS a party to this alleged fraudulent conveyance; in fact the IRS satisfies all of the necessary prerequisites for protection under Section 550(b).... *Id.* at 54.

The court found that the company's president, not a defendant, was the initial transferee by his conduct in taking control of the funds to pay another company's debt, thereby insulating the IRS from the fraudulent conveyance. *Id.*

in its entirety.[8] It then found that "[i]t is undisputed that the Bank acquired no beneficial interest from the wire transfers and exhibited no bad faith. In addition, the Bank possessed no discretion with respect to the disposition of the funds—it was constrained to follow the debtor's instructions." *In re Colombian Coffee Co., Inc., supra* at 179, *citing In re Colombian Coffee,* 59 B.R. 643, 644 (Bankr.S.D.Fla.1986). The trustee, to no avail, had urged the judge to read the statutory language of section 550 literally and hold this defendant to be an initial transferee. The court refused to literally apply section 550 to the facts before it and hold the bank liable merely because it received the wire transfer for its customer's account.

In January 1988, the Seventh Circuit, the first circuit court to confront this emerging theory, augmented the "mere conduit" concept. It introduced the "dominion and control test" to determine transferee status. *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir.1988).[9] In *Bonded* an individual, Michael Ryan, who had borrowed money from the defendant bank, was the officer of a number of currency exchanges in Illinois. One of the currency exchanges, Bonded Financial Services, issued $200,000.00 to Ryan by sending a check to the defendant bank payable to the bank's order with a note directing the bank to deposit the check into Ryan's account. After so doing, Ryan instructed the bank to debit the account and pay the balance of the loan of another one of his businesses. *Id.* at 891.

The *Bonded* court also concluded that the bank was not liable as a transferee. It remarked:

> We think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put

the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded. This perspective had impressive support under the 1898 Code, *e.g., Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823, 830 (5th Cir. 1959) (disregarding corporate forms in order to identify the entity with control over the assets), and has been employed under the 1978 Code as well, *e.g., In re Colombian Coffee Co.,* 75 B.R. 177, 178–79 (S.D.Fla.1987), *affirming* 64 B.R. 585 (Bankr.S.D.Fla.1986). *See also In re Auto–Pak, Inc.,* 73 B.R. 52 (D.D.C.1987). *Id.* at 893.

The court opined that "[i]f the note accompanying Bonded's check had said: 'use this check to reduce Ryan's loan' instead of 'deposit this check into Ryan's account' section 550(a)(1) would provide a ready answer. The bank would be the 'initial transferee' and Ryan would be the 'entity for whose benefit [the] transfer was made.'" *Id.* at 892.[10]

The *Bonded* court also addressed the ancillary issue of whether the bankruptcy court should use its equitable powers to excuse certain types of transferees, specifically agents, from repaying the preference or fraudulent transfer. The Seventh Circuit noted:

> We are aware that some courts say that an agent (or a bank in a case like ours) is an "initial transferee" but that courts may excuse the transferee from repaying using equitable powers. *See, e.g., Colombian Coffee Co.,* 75 B.R. at 179–80 (alternative holding); *In re C–L Cartage Co.,* 70 B.R. 928 (Bankr.E.D.Tenn.1987). This is misleading. "Transferee" is not a self-defining term; it must mean something different from "possessor" or "holder" or "agent". *Id.* at 894.

scenario, the bank does *not* have unrestricted use of the funds. It must apply them as *Bonded* has directed, and therefore still acts as an agent. Ryan remains the transferee and the bank benefits by having the loan to Ryan paid down. Certainly, the bank would not escape liability. Rather it would be liable as the entity for whose benefit the transfer is made. 11 U.S.C. § 550(a)(1).

---

**8.** *See supra,* note 6.

**9.** One court has identified another test-whether the transfer was "solely for the purpose of benefiting the eventual transferee." *In re Mill Street, Inc.,* 96 B.R. 268 (9th Cir. BAP 1989), *citing In re Dietz,* 94 B.R. 637, 643 (9th Cir. BAP 1988).

**10.** On this point this Court's analysis would diverge from that of the *Bonded* court. In this

The Seventh Circuit in fact expressed its concerns about this mechanism:

> We have serious doubts about the amount of equity in (the transferee's) position ... and about the propriety of judges' declining to enforce statutes that produce inequitable results. Bankruptcy statutes are not special cases. *See Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 566 (7th Cir.1986); *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th Cir. 1986). *See also, e.g., Official Committee v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987); *Guerin v. Weil, Gotshal & Manges*, 205 F.2d 302, 304 (2d Cir.1953) (A. Hand, J.). We mention the problem not to resolve it (for it is not before us) but to show that this appeal to "equity" —to deny recovery against an "initial transferee" within the statute—is different in source and scope from the way in which we have employed considerations of policy to *define* "transferee" under § 550(a)(1). Doubts about this use of equity do not imply that courts should take "transferee" for all it could be worth rather than for what a sensible policy implies it is worth. *Id.* at 894–895.

Finally, and more recently, in *In re Chase & Sanborn Corp.*, 848 F.2d 1196 (11th Cir.1988) the Eleventh Circuit also analyzed this issue of "conduit liability." It followed *Bonded's* lead and applied the "dominion and control" test. The Chapter 11 trustee sought to avoid a fraudulent transfer from a bank where the debtor maintained a checking account. In the normal course of business the defendant bank's clearing house bank would pay a check drawn on defendant bank. "If there [were] insufficient funds to cover the check drawn on the account, the payment of the check [would] automatically create an overdraft on paper." *Id.* at 1197. The defendant bank, however, would not take action on the check until noon of the following business day allowing time to inform the clearing house whether it would honor or return the check. Defendant bank would first contact the debtor to be sure that there were funds to cover the check and then contact the bank to approve the payment. *Id.* at 1198. In this particular instance, a lapse in time, approximately 24 hours, occurred between when the overdraft was created and when the transfer of funds to the account actually occurred. It was this amount which the trustee sought to recover. The Eleventh Circuit held that the defendant bank was *not* a "transferee". It invoked the "control test" and, viewing the transaction as a whole, found that the checks paid on the overdraft did not establish a "debtor-creditor relationship" between the debtor and the defendant bank. The control test, the court explained, "requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Id.* at 1199.

> We are not creating new law, or even expanding on the existing doctrine. Bankruptcy courts considering the question of whether a defendant is an initial transferee have traditionally evaluated that defendant's status in light of the entire transaction. And, in the past, courts have refused to allow trustees to recover property from defendants who simply held the property as *agents* or conduits for one of the real parties to the transaction. *Id.* at 1199–1200.

Thus the theory of "conduit liability" has emerged from courts' efforts to define the term "transferee." [11] What this Court di-

---

**11.** Generally, these courts have started at the "bottom line" and worked backwards. If the defendant seems "innocent" then courts are reluctant to find that entity is an "initial transferee." The unfortunate result of accepting this as the premise from which the logic flows, is that the court must first evaluate a defendant's innocence. Some courts have done this, found that the defendant acted in bad faith and thus very comfortably held that defendant liable as an initial transferee. *See, In re Harbour*, 845 F.2d 1254, 1257 (4th Cir.1988); *In re Musurlian*, 97 B.R. 985, 989 (Bankr.W.D.Wisc.1989) *see also, In re Baker & Getty Financial Services, Inc.*, 98 B.R. 300, 310 (Bankr.N.D.Ohio 1989); *In re Cash Currency Exchange, Inc., supra.* These courts, effectively, have grafted a new requirement of good faith onto the language of the Code in § 550(a). Only § 550(b) requires an evaluation of the good faith of the *mediate* transferee. Had Congress intended this to be part of a § 550(a) analysis it could have and would have incorporated that language.

vines from this line of cases is that these courts have employed, in essence, the basic principles of agency theory regardless of the precise terms used. Moreover, there is a common thread. In no instance where a court finds a defendant to be a "mere conduit" is there a direct creditor/debtor relationship or any other direct contractual relationship specifically related to the funds transferred between the debtor and defendant.[12] For example, the Hopgood firm in *In re Fabric Buys of Jericho, Inc.* had no direct relationship to the opposing party. It merely accepted the funds on behalf of its client with whom that party had dealt directly. The court clearly states: "Hopgood acted as the agent of Unitrac (the client), a mere conduit of funds from Fabric Buys to Unitrac, ..." *In re Fabric Buys of Jericho, supra* at 337. That court emphasized that the law firm had no direct dealings with the debtor. "Here, Unitrac (the client) had the direct business dealing with Fabric Buys that gave rise to the debt, subsequent suit, and the allegedly preferential payment." *Id.*

In *In re Black & Geddes, Inc.* it was undisputed that the bill of lading was issued by the common carrier, the principal. The debtor and the steamship agency had no direct relationship. The obligation for the freight due ran between the debtor and the principal, the common carrier. It is noteworthy that as part of its defense, the agency invoked classic agency principles. It asserted that it was the agent of a disclosed principal and thereby relieved of liability.

In *Bonded Financial Services* the defendant bank had no direct relationship to the debtor. Its officer Ryan did. The Debtor, however, directed that the funds be paid to Ryan's account. He, in turn, applied them to the loan. The *Bonded* court in its opinion, which is most frequently cited, recites basic agency law. "When A gives a check to B as *agent* for C, then C is the 'initial transferee'; the agent may be disregarded." *Bonded Financial Services, supra* at 893. It is significant that the *Bonded* court refused to apply section 105 to avoid a so-called inequitable result. This Court opines, and will demonstrate below, that if one applies basic agency principles one need not look to section 105.

*In re Chase & Sanborn Corp.* also involved facts where no "direct contractual or creditor-debtor relationship" existed between the defendant and the debtor (until the overdraft was created by the lapse in time [24 hours] between when the bank honored the check and when the funds were available to pay it). Prior to this the defendant bank was no different than the defendants in either *In re Colombian Coffee Co., Inc.* or *Bonded Financial Services, Inc.* The quote from Judge Cardozo cited by the *In re Black & Geddes* court both highlights and corroborates this Court's conclusion:

> [T]he person to be charged with liability if he has parted before the bankruptcy with title and possession, must have been more than a mere custodian, intermediary or conduit between the bankrupt and the creditor. *Directly or indirectly*, he must have had a beneficial interest in the preference to be avoided, the thing to be reclaimed. *Id.* at 875, *citing Carson v. Federal Reserve Bank*, 254 N.Y. 218, 235–236, 172 N.E. 475 (1930).

Finally, even the "dominion and control test," as formulated by the *Bonded* court, has some foundation in agency law. "In determining whether an agency relationship exists between parties to a business enterprise, which is the subject of an agreement between them, the right to control is an important factor." *Nichols v. Arthur Murray, Inc.*, 248 Cal.App.2d 610, 56 Cal. Rptr. 728, 731 (1967) citing *City of Los Angeles v. Vaughn*, 55 Cal.2d 198, 201, 10

---

**12.** *In re Moskowitz*, 85 B.R. 8, 11 (E.D.N.Y.1988) tacitly endorses this theory. The distinction, of course, goes only to determining whether an agency relationship exists. It is unrelated to whether the *underlying* cause of action is based upon a fraudulent conveyance or preference theory. Clearly, a necessary prerequisite to recover on a preference is the existence of an antecedent debt. One must distinguish, however, between prevailing on the underlying cause of action and analyzing who is a transferee from whom the trustee or debtor can recover.

Cal.Rptr. 457, 358 P.2d 913; *Malloy v. Fong,* 37 Cal.2d 356, 370, 232 P.2d 241; *Burlingham v. Gray,* 22 Cal.2d 87, 94, 99–100, 137 P.2d 9; *Robinson v. George,* 16 Cal.2d 238, 243–44, 105 P.2d 914; *Anderson v. Badger,* 84 Cal.App.2d 736, 741, 191 P.2d 768. "If, in practical effect, one of the parties has the right to exercise complete control over the operation by the other an agency relationship exists; the former is the principal and the latter the agent." *Nichols v. Arthur Murray, Inc., supra,* citing *Pacific Lbr. Co. v. Ind. Acc. Com.,* 22 Cal.2d 410, 415, 139 P.2d 892; *City of Los Angeles v. Vaughn, supra,* 55 Cal.2d 198, 201, 10 Cal.Rptr. 457, 358 P.2d 913.

■ This Court concludes that the concept of "conduit liability" can be disposed of and "transferee" may be defined by utilizing simple agency principles with all its ramifications and nuances. This conclusion, while seemingly simplistic, obviates the need for the convoluted analyses which have resulted from both the "innocent conduit" theory and the need to invoke the Court's "equitable powers under section 105(a) . . . to prevent an inequitable result." *In re Fabric Buys of Jerico, Inc., supra* at 337. This is not new law, but is consistent with the concepts already propounded by the courts thus far, regardless of the label they have attached to them.

■ In light of the foregoing, this Court must analyze the facts of this case to determine whether Schwab and the other discount brokerage houses are transferees or merely agents within the ambit of 11 U.S.C. § 550. It is undisputed that Schwab and other defendants held shares in "street name." Accordingly, Kaiser's records would indicate that Schwab was the shareholder of record. Kaiser had no information as to who the true owner was or whether anyone other than Schwab owned the shares. In addition, the affidavits of Schwab indicate that Schwab *generally* held the shares in street name only for the benefit of the customers, the beneficial owners. Implicit in the use of the word "generally" is that there are some occasions when Schwab trades on its own account. In those instances Schwab is the principal, and not merely an agent for a beneficial owner. Regardless, in Kaiser's eyes, it contracted with Schwab, its records indicate Schwab is the record owner, Kaiser disbursed funds to Schwab on an unrestricted basis, and Kaiser sued Schwab as the transferee of the funds.

Schwab, on the other hand, has raised its agency status as a defense. Schwab pleads that it is merely an agent of the beneficial owners, its customers, the principals.[13] Kaiser knows that it is a discount brokerage house and that, as a general matter, it does not trade for its own accounts and does not render investment advice. Kaiser, therefore, has some knowledge of that agency and Schwab should be relieved thereby of liability.

■ This Court is not persuaded. It is hornbook law, which hardly needs repeating, that if a party enters into a contract in his own name and receives the benefits of that contract in his name, he is liable for any obligations arising out of the transaction. This is true even if he is, in fact, not acting for his own account but is acting for the account of some undisclosed principal. *Accord, Cunningham v. Robinson,* 196 Cal. 672, 239 P. 313 (1925); *Craig v. Buckley,* 218 Cal. 78, 21 P.2d 430 (1933); *Wedge v. Security–First National Bank of Los Angeles,* 219 Cal. 113, 25 P.2d 411 (1933);

---

**13.** The Margin and Short Account Agreements entered into between Schwab and its customers contains a clause which reads as follows:

A pledge of securities and other property. You are hereby authorized on any amount due in my account, without regard to whether you have in your possession or subject to your control at the time thereof other securities or property of the same kind and amount, to pledge and repledge all securities and other property now or hereafter held, carried, or maintained by you in your possession in any of my accounts, or any part thereof, either separately or together with securities and any other property of other customers, either for the amount due you from me *or for a greater sum.* (Emphasis added.)

Thus Schwab could act as a principal with respect to these securities by virtue of having the securities in its name and pursuant to the beneficial owner's authorization.

*G.W. Andersen Construction Co. v. Mars Sales*, 164 Cal.App.3d 326, 210 Cal.Rptr. 409 (1985). Also, in classic agency theory, unless otherwise agreed a person purporting to make a contract with another for a partially disclosed principal is a party to the contract and bound thereto as a principal. *Cunningham v. Robinson, supra, citing Restatement (Second) of Agency,* § 321. The principal is partially disclosed if the other party has notice that the agent is or may be acting for a principal but has no notice of the principal's identity. *G.W. Andersen Construction Co. v. Mars Sales, supra, citing Restatement (Second) of Agency* § 4(2). Thus, even if this Court accepts Schwab's argument that Kaiser knew that Schwab was a discount brokerage house and that it "generally" did not trade on its own account, the strict application of agency law requires knowledge of the identity of the principals and not just the fact of the agency.

■ Schwab and the other similarly situated defendants urge this Court to apply its equitable powers under 11 U.S.C. § 105 to limit Kaiser's recovery from them. This Court concurs with the language of the *Bonded Financial* court cited above and the cases cited therein. Specifically, this Court finds the language of *In re Robinson Bros. Drilling, Inc.*, 97 B.R. 77, 82 (W.D.Okla.1988) apt:

> The equitable powers of the bankruptcy court under section 105 to avoid strict construction of the Code is limited. *Official Comm. of Equity Security Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988) (quoting *In re Chicago Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th Cir. 1986), *cert. denied*, 481 U.S. 1068, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987) ("the fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance

with his personal views of justice and fairness, however, enlightened those views may be"); *Guerin v. Weil, Gotshal & Manges*, 205 F.2d 302, 304 (2nd Cir.1953).

However enlightened this Court believes its views to be, section 105 is not available to redistribute the rights of the parties according to the judge's views.

Moreover, when one views the facts of this case from the perspective of agency law, the need to avoid inequity is no longer a concern. Clearly, at state law, no inequity results when an agent acts for a principal and enters into a contract without disclosing that relationship and then is found liable on that contract as a principal. As record owner of the shares, Schwab tendered the shares, albeit of its customers, to Kaiser and Kaiser paid the LBO cash consideration to Schwab in response thereto. Thus Schwab was a "transferee" of the funds within the meaning of 11 U.S.C. § 550(a) and is answerable as a result.[14]

■ Finally, if it could invoke its equitable powers, this Court would refuse to do so where adequate remedies are available at law. Schwab, if found liable, can recover from its customers, its principals.

## V. SECTION 546(e) ANALYSIS

■ The Bear Defendants urge this Court to apply 11 U.S.C. § 546(e) to limit the trustee's powers to avoid recovery of transfers to brokerage houses only upon a showing of actual fraud under section 548(a)(1). Section 546(e) states:

> Notwithstanding sections 544, 545, 547, 548(a)(2) and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, *made by or to* a commodity broker, forward contract merchant, stockbroker, financial institution,

**14.** While not before this Court at this time, this seemingly simplistic analysis might require that the clearing houses and nominees, who always conduct business in their own names and have not disclosed their principals, be found liable as transferees. A statutory exception, however, is available to them by section 8–320 of the Uniform Commercial Code. To reiterate, this is not before the Court at this time, but the Court raises this only to demonstrate the soundness of the theory which it concludes is best applied to these cases.

or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title. (Emphasis added).

While this Court was unable to find any case law specifically applying or interpreting this provision, it is inclined to agree with the Bear Joinder defendants that section 546(e) has general applicability to bankruptcy cases and is not limited to cases where the debtor is a stockbroker or commodities broker as urged by the Debtor. The legislative history of section 546 clearly supports this conclusion. Section 546(e), previously (d), was enacted in 1982 contemporaneous with the repeal of section 764(c). Section 764(c) was among the provisions of Subchapter IV of Chapter 7 which apply only to a case filed by a commodity broker. 11 U.S.C. § 103. Section 764(c) sheltered margin payments and other deposits from the avoiding powers of the trustee except where the trustee or debtor could prove actual fraud under section 548(a)(1). This section was intended to facilitate and protect transactions made in the ordinary course of business in the market. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 391–92, U.S.Code Cong. & Admin. News 1978, p. 5787. The legislative history further explains that section 764(c) was repealed and incorporated into section 546(c) for clarification. H.R.Rep. No. 97–420, 97th Cong.2d Sess. 5 (1982), U.S.Code Cong. & Admin.News 1982, p. 583.

The language of section 546(e), formerly (d), now includes "settlement payments." The legislative history notes:

> [T]he provisions apply to margin or settlement payments made by *any debtor* whether or not such debtor is a commodity broker. The new section 546(d) reiterates and clarifies the provisions of current section 764(c). The new section also encompasses both stockbrokers and securities clearing agencies. Thus, it has been placed among the general provisions in chapter 5 of title 11, rather than

among the commodity broker provisions of subchapter IV of chapter 7. 128 Cong.Rec. S8132–3 (daily ed. July 13, 1982) (remarks of Sen. Dole). (Emphasis added).

The critical question then becomes, is the LBO Consideration a settlement payment as contemplated by the language of section 546(e)? Of course, Schwab argues that the LBO Consideration is a settlement payment and Kaiser argues that it is not.

Section 741(8) defines "settlement payment" rather circularly. It states:

> "Settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

This definition is not particularly enlightening.

Only two courts have attempted to interpret section 741(8). *In the Matter of Bevill, Bresler & Schulman Asset Management Corporation v. Spencer Savings & Loan Association, et al.*, 878 F.2d 742 (3rd Cir.1989); [15] *In re Bevill, Bresler & Schulman, Inc.*, 94 B.R. 817 (D.N.J.1989). The *Bevill* District Court, as noted by the Third Circuit, "looked at definitions of 'settlement' applicable to orthodox corporate securities transactions between a stockholder and a customer." *In the Matter of Bevill, Bresler & Schuman Asset Management Corp., supra*, 878 F.2d at 750. Specifically, the *Bevill* District Court, quoting its earlier unpublished opinion, explained the concept of "settlement" as follows:

> The term "settlement" has a well recognized meaning in the securities industry. As stated in the New York Stock Exchange's *The Language of Investing Glossary* (1981) at page 30, "settlement" is the
>
> > [c]onclusion of a securities transaction when a customer pays a broker/dealer

---

**15.** The precise questions certified in this appeal related to section 546(f), dealing with repurchase agreements and federal government securities. The court mentioned the "unique character of the settlement process in government se-

curities repo transactions." Thus the ultimate *holding* of this case has no particular applicability here. The court's analysis of the concept of settlement payment, however, is instructive.

for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale.

Trades customarily settle within five business days of being executed:

> On settlement day, which is normally five days after a trade is executed, the seller's broker is supposed to deliver the bonds or stock certificates to the buyer's broker. If delivery is not made on time the first broker has a "fail to deliver" item. It should be noted that fails occur only·between brokers—the failure of the selling customer to hand over to his broker the stock which he sold is not classified as a fail-to-deliver.

N. Wilson, Philips and T. Russo, Regulations of Brokers, Dealers and Securities Markets (1977), at page 6–13, not 28. *In the Matter of Bevill, Bresler & Shulman, Inc. v. Spencer, et al., supra at 829, citing Saul Cohen, Trustee v. Spencer Savings & Loan Association,* Civ. No. 87–1154 (D.N.J. October 11, 1988) (transcript of opinion).

The *Bevill* District Court found the payment at issue was *not* a settlement payment because the delivery occurred outside of five days. The *Bevill* Court of Appeals disagreed with the District court and concluded that " 'settlement payment' does not only mean payment of cash to the dealer by the purchaser, but also encompasses transfer of the purchased securities to the purchaser from the dealer." *In the Matter of Bevill, Bresler & Schulman Asset Management Corporation v. Spencer, et al., supra,* 878 F.2d at 752. The Circuit Court commented:

> It is well understood in the securities market that the settlement process does not end with the purchaser's payment for the securities; rather, the process continues on to include the record transfer of the securities. Section 17A(a) of the Securities Exchange Act of 1934 ("1934 Act") 15 U.S.C. § 78q–1(9), mandating the establishment of a national securities clearance and ("1934 Act") 15 U.S.C. § 78q–1(9), mandating the establishment of a national securities clearance and settlement system, specifically recognizes that the transfer of record ownership of securities is an integral element in the securities settlement process.... *Id.* at 751.

The Bear Defendants cite to these cases as authority for its position. Kaiser, on the other hand, relies on one commentator who describes the settlement process as follows:

> Normally a buyer places an order through his broker to purchase a certain number of shares of a particular stock for a given price. The buying broker dealer and the selling broker dealer then agree on the trade terms, e.g., security, number of shares and price, and confirm the existence of a contract that is then scheduled for settlement at a clearing agency. This is called trade comparison. These trade comparisons occur at the exchange, at a clearing agency on behalf of an exchange, or a combination of both. The trades are reported to clearing agencies, e.g., NSCC. Trades are then cleared and settled through a clearing corporation, e.g., DTC, which notes its member broker-dealer's settling purchases and sales in each security to arrive at daily net settlement obligations. The broker-dealers then settle those net obligations with the clearing corporation, which guarantees the settlement obligations of its members broker-dealers with those broker-dealers' counter trading parties. Security deliveries are then generally made automatically between NSCC and its members through debits and credits on their accounts and the DTC accounts. The money settlement is made by certified check. This all occurs within five days of the date when the customer places its buy or sell order. Kaiser Brief (March 6, 1989) at pg. 12–13, citing from Division of Market Regulation, U.S. Securities and Exchange Commission, The October 1987 Market Break 10–1 through 10–5 (1988).

From all of the foregoing this Court gleans that a settlement payment contemplates the consummation of an isolated trade between a customer and dealer for cash in the ordinary course of the brokerage industry.

A mandatory redemption of stock as part of this LBO is significantly different from a securities trade. The "exchange" of shares in this case, for *both* cash and securities, occurs in response to a corporate dictate and has global implications. It affects all shareholders. Schwab is just one of a class involved in this "exchange" of shares for shares and cash. The Proxy Statement and Prospectus furnished in connection with the solicitation of proxies for the Annual Meeting of Stockholders at which the LBO was approved provides:

> Upon the Merger, each outstanding share of Common Stock will be *converted into the right to receive* $22.00 in cash plus one share of Series A Preferred Stock, $1 par value ..., and one share of Series B Preferred Stock, $1 par value ..., of the Surviving Corporation.... Proxy Statement and Prospectus, p. 1. (Emphasis added).

It further provides:

> As soon as practicable after the Effective Time, the Surviving Corporation will mail to each holder of record of Common Stock, a letter of transmittal (together with instructions) with which such stockholder can effect the exchange of his Common Stock certificates for cash and certificates evidencing the number of shares of New Preferred Stock to which he is entitled. Promptly after receipt of such letter of transmittal and instructions, each such holder should send to the Disbursing Agent a properly executed letter of transmittal and all the certificates, in proper form for transfer, evidencing his shares of Common Stock. Upon receipt of the letter of transmittal and such certificates, the Disbursing Agent will mail to the holder or his transferee a check, in an amount equal to $22.00, without interest, for each share represented by such stock certificates, a certificate representing the shares of Series A Preferred Stock to which the holder is entitled, and a certificate representing the shares of Series B Preferred Stock to which the holder is entitled. No dividends will be paid on shares of New Preferred Stock unless share certificates for the corresponding Common Stock

have been received by the Disbursing Agent.

> As soon as practicable after the Effective Time of the Merger, the Disbursing Agent will disburse to the holder of each 1982 Stock Option the amount of cash and certificates representing the number of shares of Series A Preferred Stock and Series B Preferred Stock that the holder of such 1982 Stock Option has the right to receive.

Clearly no trade comparison is made. The shares are tendered in exchange for cash and securities—at a set price with the number necessarily predetermined by what the shareholder owns. It is mandatory that the shares be physically tendered. It is not merely a bookkeeping entry at a clearing house, the method of delivery focused upon by the *Bevill* court in defining "settlement".

This Court thus finds that the LBO Consideration was not a "settlement payment" as defined in 11 U.S.C. § 741(8) and, therefore, that 11 U.S.C. § 546(e) does not apply to limit Kaiser's recovery from the various stockholders such as Schwab, or others for that matter. This conclusion is not inconsistent with the Third Circuit's decision. In fact, its opinion both supports and guides this Court's decision. The definition of "settlement" propounded is the same and its admonishment to view the transaction as a whole has been heeded. When one views this transaction, the consummation of the LBO, whether in whole, or even in part for that matter, it is clearly distinguishable from the concept of "settlement" subscribed to by that court.

## VI. CONCLUSION

This Court finds that Schwab and the other brokers who have joined in the Schwab Motion may be held liable as initial transferees for funds received by them in payment for Kaiser shares held by the broker in street name for its customer. They cannot assert the defense of their agency where the identity of the principals, their customers, was undisclosed to Kaiser.

Accordingly, summary judgment is DENIED as to these defendants.[16]

---

**16.** As mentioned above, although Securities Settlement Corporation, a clearing agent, filed a joinder brief, this order goes specifically to the Schwab-type defendants. The nominees and clearing houses have reserved the right to, and may, file their own motion for summary judgment.